**ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN AND BROTHERHOOD OF RAILROAD TRAINMEN,** Plaintiffs-Appellees,

v.

**CLINCHFIELD RAILROAD COMPANY,** Defendant-Appellant.

No. 18519.

United States Court of Appeals
Sixth Circuit.

March 4, 1969.

Ferdinand Powell, Jr., Johnson City, Tenn., for appellant; A. K. McIntyre, Gen. Sol., Legal Department, Clinchfield Railroad Company, Erwin, Tenn., on brief.

John S. McLellan, Kingsport, Tenn., for appellees; D. Bruce Shine, Kingsport, Tenn., on brief.

Before McCREE and COMBS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

COMBS, Circuit Judge.

The Order of Railway Conductors and Brakemen and the Brotherhood of Railroad Trainmen filed this action to impeach an award under Section 9 of the Railway Labor Act, 45 U.S.C. § 159. Defendant-appellant, Clinchfield Railroad Company, moved to dismiss the action as beyond the court's jurisdiction. The district court denied the railroad's motion and entered summary judgment, granting the relief sought by the unions. This appeal followed.

The controversy concerns the railroad's rights with regard to the "pooling of cabooses." It had been a longstanding custom of Clinchfield Railroad that designated cabooses would be assigned to certain train runs. Thus, workers on a particular run were always assured of having the same caboose. The men could thereby equip and maintain the caboose to their liking and assure themselves that off-duty time and lay-overs would be spent in comfortable and familiar surroundings.

This practice was not without difficulty for the railroad. When cabooses were not being used, they were placed on a siding at the terminal specifically reserved for cabooses. Apparently it was not feasible to place the cabooses on the siding in any particular order. Thus, when a given caboose was needed, there might be several other cabooses in front of it, necessitating considerable movement and replacement of cars to get a caboose on its assigned train.

The collective bargaining agreements between Clinchfield and the unions provided procedures to be followed should the railroad desire to change the system of caboose assignment and "pool" its cabooses, that is, assign cabooses on a random basis, or furnish lay-over facili-

ties other than cabooses. The purpose of these procedures was to require an orderly resolution of any differences that might arise over the employees' substitute accommodations. In relevant part, these procedures were as follows:

"(1) Whenever the carrier desires to so pool its cabooses, it shall give notice to the General Chairman or General Chairmen of such intention, specifying the territory and service involved, whereupon the carrier and employee representative shall, within 30 days, endeavor to agree upon any facilities that should be furnished to provide accommodations substantially equivalent to those formerly available on the cabooses and used by the employees and on appropriate arrangements for supplying and servicing such pooled cabooses.

"(2) In the event the carrier and such representatives cannot so agree on the matter, any party involved may invoke the services of the National Mediation Board.

"(3) If mediation fails, the parties agree that the dispute shall be submitted to arbitration under the Railway Labor Act, as amended. The decision of the Arbitration Board shall be final and binding upon both parties." [1]

The general chairmen of appellee unions were asked to meet on April 6, 1965, with L. R. Beals, personnel officer of the Clinchfield Railroad. Beals informed them that the railroad had decided to pool all cabooses. The unions advised him that they were opposed to such action, but the railroad announced that commencing April 16, 1965, all cabooses would be pooled. The unions responded by demanding that the railroad comply with the above quoted procedures of the collective bargaining agreements, and the railroad agreed.

The dispute continued through the stages of negotiation and mediation without resolution, the parties being in conflict as to the substitute facilities which should be provided. The unions contended that the railroad had no right to pool the cabooses. This contention was based on a clause of the collective bargaining agreements which provided as follows:

"The employees affected by this rule and the carriers represented by the Eastern, Western and Southeastern Carriers' Conference Committees, being desirous of cooperating in situations *where train service can be improved and trains expedited* by the pooling of cabooses, adopt the following: * * *." (Emphasis ours.)

The unions contend that the italicized clause made it incumbent upon the railroad to show that train service could be improved and trains expedited prior to any negotiations on facilities. In spite of this contention, however, the unions vigorously pressed their demands for various substitute facilities. By September 8, 1965, the dispute had progressed through the mediation stage without success and the railroad wrote the National Mediation Board, requesting that an arbitration board be established.

On September 9, 1965, the unions requested the mediation board to postpone the case in order to allow the parties more time to resolve the dispute, or to permit the unions to seek an interpretation of the bargaining agreements. The board denied this request and requested that the parties proceed toward arbitration. The railroad named an arbitrator and asked the unions to do likewise. The unions responded by naming two arbitrators, one from each organization. The parties being unable to agree on a neutral arbitrator, the railroad requested that the mediation board name such a person.

The unions asked that the railroad's request for a neutral arbitrator be held in abeyance by the board until a construction of the bargaining agreements

---

1. These procedures are set out in Article 7, Pooling of Cabooses, in the Brotherhood of Railroad Trainmen Agreement of May 25, 1951, and the Order of Railway Conductors and Brakemen Agreement of May 23, 1952.

could be obtained. The requested delay was denied by the mediation board and, shortly thereafter, a neutral arbitrator was named. The arbitration board was eventually composed of five members since, following the designation of two arbitrators by the unions, the railroad named another member.

The unions again contended at the arbitration proceedings that the board was without jurisdiction until the bargaining agreements were interpreted in other proceedings. The neutral arbitrator, however, ruled that jurisdiction existed and the merits of the dispute were considered. An arbitration award was made and, on May 3, 1967, the award was filed in the United States District Court for the Eastern District of Tennessee, as required by 45 U.S.C. §§ 157 Third (f) and 159 First.

Sections 7 and 9 of the Act require that, following submission of a controversy to arbitration and the arbitrators' resolution of the matter, the award and the record of the proceedings shall be filed in an appropriate district court. In the absence of a petition to impeach the award within ten days after such filing, judgment is entered upon the award and it becomes final.

The unions filed a timely petition to impeach the arbitration award. The district court in holding for the unions found that the statutory provision of 45 U.S.C. § 157 First, requiring an arbitration board of either three or six members, was not complied with. The railroad's motion to dismiss the action as beyond the court's jurisdiction was based on the theory that the arbitration was held pursuant to common law rather than the Railway Labor Act. This motion was properly dismissed since it is clear that, in view of the negotiation procedures actually followed, the arbitration was held pursuant to the Act.

The Railway Labor Act contains no requirement of compulsory arbitration. The mandatory provisions of the Act are exhausted when the parties finish mediation. As an alternative to self-help in the form of unilateral contract change, or a strike, the Act provides a voluntary arbitration procedure which may be invoked upon the parties' written agreement to arbitrate. The unions' principal argument for sustaining the district court's decision stems from the supposed inadequacy, or the absence, of an agreement to arbitrate as contemplated by Section 8 of the Act. 45 U.S.C. § 158.

The grounds upon which a district court may properly impeach an arbitration award are enumerated in Section 9 Third of the Act. 45 U.S.C. § 159. The unions contend on this appeal that the award was properly set aside by the district court because "the proceedings were not substantially in conformity with [the Act]." 45 U.S.C. § 159 Third (a). They complain especially about the improper number of arbitrators and the lack of a specific agreement to arbitrate.

■ The courts are properly reluctant to enter a controversy which is subject to arbitration or to discard the fruits of an arbitration fairly conducted. United Steelworkers of America v. Enterpris Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

■■ It is also well settled that defects in proceedings prior to or during arbitration may be waived by a party's acquiescence in the arbitration with knowledge of the defect. Chicago R. I. & P. Ry. Co. v. Union Pac. R. Co., 254 F. 235 (8th Cir. 1918); Arbitration: Ilios S & T Corp. and American Anthracite & Bituminous Coal Corp., 148 F.Supp. 698 (DC N.Y.1957); Petrol Corporation v. Groupement D'Achat Des Carburants, 84 F.Supp. 446 (DC N.Y.1949); 6 C.J.S. Arbitration and Award § 69 (1937). Moreover, if the impeaching party's own action contributes to a variance from the prescribed procedure, such party may be estopped to complain of the variance. 5

Am.Jur.2d, Arbitration and Award § 183 (1962).

■ We conclude that the district court erred in impeaching the arbitration award. The district judge in his memorandum opinion emphasized that the arbitration board was composed of five members, whereas the statute, 45 U.S.C. § 157 First, provides that the board shall consist of three persons or, if the parties to the controversy so stipulate, of six persons. We are of the opinion that the unions waived their right to object to the statutory departure by participating in the arbitration proceedings without objection on this point.

■ The difficult question concerns the sufficiency of the agreement to arbitrate required by Section 8 of the Railway Labor Act. While no specific agreement to arbitrate was executed, we think the collective bargaining agreement itself was such an agreement. To the extent the bargaining agreement does not meet the requirements of the Act, the variance was waived by the unions.

■ The procedures of the collective bargaining agreements, which culminated in the arbitration of this dispute, were initiated at the insistence of the unions. At each of the three procedural levels—negotiation, mediation, and arbitration—the unions presented their views on the merits of the dispute. The only objection made by the unions was that the railroad had no right to pool cabooses and that the case should be held in abeyance until an interpretation of the bargaining agreements could be obtained. That point was decided adversely to the unions by the mediation board and by the arbitrators. The correctness of that decision was not raised in their complaint to impeach the award, apparently because the unions recognize that a court is reluctant to remove a dispute from arbitration under the guise of interpreting a bargaining agreement. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

The judgment of the district court is reversed and the case is remanded for entry of judgment on the award, as provided by 45 U.S.C. § 159 Second.