**SHEET METAL WORKERS INTERNA-TIONAL ASSOCIATION, LOCAL UNION NO. 91, Plaintiff,**

v.

**BRIDGE, STRUCTURAL & ORNAMEN-TAL IRONWORKERS, LOCAL UNION 111, and J & J Steel Erectors, Inc., Defendants.**

No. 79–4027.

United States District Court, C. D. Illinois.

Aug. 29, 1980.

Sherman M. Carmell, Chicago, Ill., Robert T. Park, Rock Island, Ill., for plaintiff.

Arthur W. Eggers, Rock Island, Ill., for J & J Steel.

Roger N. Gold and Phillip J. Zisook, Chicago, Ill., Ralph H. Heninger and Joseph C. Creen, Jr., Davenport, Iowa, for Bridge, Structural & Ornamental, Ironworkers.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

This complaint arose out of a jurisdictional dispute involving work performed by members of the defendant Bridge, Structural & Ornamental Ironworkers, Local 111, which the plaintiff, Sheet Metal Workers International Association, Local 91, claimed to have been properly awardable to its members. The defendant J & J Steel Erectors, Inc. is a corporation headquartered in the State of Iowa and an employer engaged in an industry affecting interstate commerce.[1]

The cause is now before the court on cross-motions for summary judgment. By those motions, all parties concede that there exists no genuine issue as to any material fact.

In 1979, J & J was engaged in the construction of phases II and III of a construction project in Rock Island, Illinois, which is designated as the centennial warehouse project. Within the purview of this complaint, its contractual undertaking involved the installation of Varco Pruden metal roof decking lighter than ten gauge, hereinafter the disputed work. Plaintiff claims entitlement to that work for its members.

J & J was a member of Master Builders of Iowa, headquartered at Des Moines, Iowa, and of Quad Cities Builders Association, headquartered at Rock Island, Illinois.[2] The dispute peripherally involves a collective bargaining agreement between QC, on behalf of its associated members, and Local 111. J & J had no collective bargaining agreement with plaintiff.

The dispute directly involves a written agreement entitled "Plan for the Settlement of Jurisdictional Disputes in the Construction Industry," which had been negotiated by the Building Trades Department, AFL–CIO, on behalf of all of its constituent unions. Both plaintiff and Local 111 were parties to that agreement, by reason of the fact of its adoption by AFL–CIO. Associated General Contractors of America, hereinafter AGC, was one of several construction industry associations which were signatories to the plan. At all relevant times, MBI was a chapter of AGC. QC was not affiliated with that association.

The plan is a negotiated agreement between AFL–CIO and the signatory employer associations, designed to provide a procedure for the settlement of jurisdictional disputes without strikes or work stoppages and without the necessity of resorting to proceedings before the National Labor Relations Board under Section 10(k) of the Labor Management Relations Act. 29 U.S.C. § 160(k). The plan is implemented by a Joint Administrative Committee composed of representatives of both labor and management. It created an Impartial Jurisdictional Disputes Board, hereinafter IJDB, and vested that Board with jurisdiction to consider and decide jurisdictional disputes arising out of work assignments.[3] Decisions by the IJDB are appealable to the Joint Committee within ten days after any such decision is rendered.

On February 26, 1979, after J & J had assigned the disputed work to members of Local 111, plaintiff advised its International Union that it claimed the disputed work. It requested the International Union to "please attempt to adjust" the dispute. On March 23, 1979, plaintiff advised J & J by

---

1. The parties are hereinafter respectively referred to as plaintiff, Local 111, and J & J.

2. Both are construction employer associations, which are hereinafter referred to respectively as MBI and QC. Although QC was not directly affiliated with MBI, the two associations did maintain a financial and administrative rela-

tionship. Also, in 1979 the executive secretary of QC was the manager of the Rock Island, Illinois, office of MBI.

3. The plan defines a "jurisdictional dispute" as "a dispute over the assignment of work" in which "the employer has an interest."

letter that it claimed the right to the disputed work and that it had submitted that claim "through the regular channels." The claim was submitted to the IJDB. On April 6, 1979, the parties were notified by the IJDB of its decision that plaintiff was entitled to the disputed work. That decision was not appealed.

The phase II work was completed by members of Local 111 in June, 1979. Plaintiff filed its complaint herein on June 21, 1979, praying damages to compensate it and its members for that work which it alleged to have been wrongfully performed by Local 111.

The phase III disputed work was assigned the same way. On June 22, 1979, plaintiff notified J & J by letter that it claimed the work and that it would invoke the plan procedures before the IJDB. On July 20, 1979, that body notified the parties that it had determined that plaintiff was entitled to the disputed work. Again, no appeal was taken. The work was completed in August, 1979, after which plaintiff amended its complaint, adding a second count for damages on account of the disputed work under phase III of the project.

The complaint is grounded upon the provisions of Section 301(a) of the Labor Management Relations Act. 29 U.S.C. § 185(a). It rests upon plaintiff's position that J & J had a contractual obligation to comply with the decisions of the IJDB, which is enforcible under Section 301(a).

Section 10(k) of the Labor Management Relations Act empowers the NLRB to hear and determine jurisdictional disputes. That Section further provides that the NLRB shall abstain from exercising that power if it finds that the parties have adjusted the dispute or that they have agreed upon methods for the voluntary adjustment thereof. Section 301 also vests jurisdiction in the district courts to enforce 10(k) awards, i. e., awards by the NLRB or awards obtained through an agreed-upon method for voluntary adjustment. Thus, Section 301 provides a jurisdictional basis for enforcement of IJDB awards under the plan, e. g., *Local 416, Sheet Metal Workers*

*v. Helgesteel Corp.*, 507 F.2d 1053 (7th Cir. 1974); *Drywall Tapers & Pointers, Local 1974 v. Plasterers' Union*, 601 F.2d 675 (2d Cir. 1979), and the concomitant jurisdiction to determine whether an IJDB award is valid and enforcible against a party sought to be charged.

The critical issue before the court is stated by a partial paraphrase of language from plaintiff's brief. The IJDB "decisions * * * must be enforced if the parties were bound to the Plan. The only issues then are whether J & J was a party to the Plan," or if it was not a party to the plan, whether it "may raise the nonparty defense."

■ It must be concluded, from undisputed facts, that J & J was not a party to the plan. An employer is bound to the plan only when any one of three circumstances exists, namely: (1) that it had executed a written stipulation to be bound by the plan, or (2) that it is a member of an employer association which had authority to bind its members to the plan and which exercised that authority by a written stipulation to so bind its members, or (3) that it is a signatory to a collective bargaining agreement which contains a provision that jurisdictional disputes be settled by invoking the plan procedures.

■ J & J did not stipulate its acceptance of the plan. As above noted, it had no collective bargaining agreement with plaintiff. Its agreement with Local 111 does not adopt the plan procedures as a basis for settling jurisdictional disputes. Thus, if J & J was party to the plan, that status must have resulted from its membership in MBI, in conjunction with MBI's affiliation with AGC.

MBI had not stipulated to bind either itself or its members to the plan, and the question whether AGC's being a signatory to the plan had the legal effect of binding its members and chapters to the plan, must be answered in the negative.

It is not necessary to address the question whether AGC did have the authority to bind its members and chapters to the plan.

The language of the plan itself permits no area for debate. It is clear from that language that AGC did not, either expressly or by implication, exercise whatever power it did have in that respect. The essence of the plan is voluntary participation. AGC did not stipulate to be bound by the plan. It and the other contracting employer associations undertook to "encourage participation in the Plan by their chapters and members * * *." That undertaking contemplated that AGC would advise its members and chapters of the plan and encourage each of them to adhere to the plan by a voluntary, written stipulation to be bound. AGC also agreed to advise the IJDB of the refusal of any of its members and chapters to so stipulate.[4]

AGC's conduct, as reflected by exhibits before the court, is wholly consistent with the written provisions of the plan. After it signed the plan, it directed letters to its members and chapters advising each of them of the fact of the plan, which stated that the concept of the plan "is that participation is to be only by voluntary stipulation by each contractor or his authorized representative." A subsequent communication to those affiliates, which enclosed proposed stipulation forms, stated that, "Although A.G.C. * * * is signatory to the agreement, that action does not bind A.G.C. members or chapters to the Plan."

It seems clear that plaintiff relied solely upon the plan itself when it invoked the intervention of the IJDB into this dispute. When requested by interrogatory to identify all documents upon which it relied to show that J & J was a party to the plan, plaintiff identified the plan itself, the contract between QC and Local 111, the by-laws of QC, and a policy statement adopted by AGC. With the exception of the plan, each of those documents had been provided to plaintiff in the course of discovery procedures. Nothing contained in any of those documents can be construed to constitute either a stipulation by J & J to be bound to the plan or a stipulation by AGC which purported to bind its members and chapters to the plan. The conclusion is unavoidable that J & J was not a party to the plan.

It seems to be equally clear that plaintiff cannot prevail upon its theory of its detrimental reliance as a bar to J & J's assertion of a "non-party" defense to the complaint. Plaintiff's position is delineated in the following excerpt from its brief:

"The plaintiff's reliance on J & J's participation in the Plan is shown by its immediate resort to the Plan procedures to claim the undisputed work. At no time during or after the two Plan proceedings did J & J advise either the plaintiff or the Board that it was not bound by the Plan. And J & J has not submitted proof that AGC notified the Board that MBI had refused to be bound by the Plan as required by Article II, § 1(b) of the Plan. Thus the uncontroverted evidence is that AGC signed the Plan; that MBI did not, as required by the Plan, notify the Board of MBI's nonparticipation; and that J & J did not object to the Board's jurisdiction until it answered this suit. As a matter of law, the plaintiff has established the requisite apparent authority and thereby agency."

Plaintiff relies upon several Illinois decisions which treat the law of apparent agency and the doctrines of ratification and estoppel which may bind a principal to a contract by the proof of apparent agency.[5]

---

4. If any emphasis upon voluntary participation as being the cornerstone of the whole plan is needed, that emphasis is provided by the language of the agreement, which states that the IJDB shall not recognize any contractor agreement if that Board found the agreement to have resulted from coercion. Thus, the agreement provided that the IJDB shall not recognize any contractor agreement which it determines to have resulted from any unlawful strike or other conduct "which is contrary to the voluntary nature of this Plan * * *."

5. *E. g., White Star Mining Co. v. Hultberg*, 220 Ill. 578, 77 N.E. 327 (1906); *Connett v. City of Chicago*, 114 Ill. 233, 239, 29 N.E.2d 280 (1885); *Chalet Ford, Inc. v. Red Top Parking, Inc.*, 62 Ill.App.3d 270, 274, 19 Ill.Dec. 573, 379 N.E.2d 88 (1978); *Elmore v. Blume*, 31 Ill.App.3d 643, 334 N.E.2d 431 (1975); *Karetzkis v. Cosmopolitan Nat. Bank*, 37 Ill.App.2d 484, 490, 186 N.E.2d 72 (1962).

Under those doctrines, a principal does become bound to a contract if he has acted, when faced with demands against him, in such manner as to mislead a third party to his detriment to presume the fact of an apparent agency. Those cases are inapposite to uncontroverted facts here.

Plaintiff's statement of position, as above quoted, assumes the existence of certain facts which are not shown, indulges certain inaccuracies as to facts which are shown, and depends in part upon an impermissible interpretation of the language of the plan. It incorrectly assumes the apparent agency of AGC to bind J & J to the plan. The existence of any appearance of agency must rest upon the language of the plan itself. At the expense of being repetitious, nothing in the language of the plan can be construed to suggest that AGC presumed to sign the plan as the agent of J & J, MBI, or any other employer or employer association. An appearance of agency did not exist when plaintiff resorted to the IJDB procedures.

The statement of position also assumes that AGC did not notify the IJDB that MBI had rejected the plan, without anything to support that assumption. In fact, the absence of a factual basis for that assumption is deemed admitted by plaintiff's assertion that "J & J has not submitted proof that AGC notified the Board" of MBI's refusal to adopt the plan. Not only does that assertion appear to be a misallocation of the burden of proof, but it also presumes that J & J, not a signatory to the plan, must bear the onus of AGC's assumed default.

■ The doctrine of detrimental reliance upon apparent agency presupposes the existence of a contract which would appear on its face to bind a principal. In the context of the undisputed proof, no contract is shown to exist. The plan merely invited the creation of contractual relationships by the unilateral and voluntary action by contractors or contractors' associations stipulating acceptance of the plan. Absent proof that J & J, or some other entity which had the authority to bind J & J, had stipulated to be bound, there was no contract, but only the plan itself.

■ The doctrine of detrimental reliance also rests upon the existence of some act or deed which would be inclined to mislead a third party to act to his detriment upon the misleading impression thereby created. Perforce, any such misleading act or deed must have occurred not later than contemporaneously with the taking of the action which is alleged to have been detrimental. Plaintiff points to no act by J & J, which preceded its invoking the plan procedures, which would have tended to lead it to believe that J & J had stipulated to the plan. It does not even assert that J & J was advised in advance of plaintiff's invoking the plan that it intended to do so, unless the statement that a claim would be submitted through "regular channels" must be interpreted to say that the claim would be submitted under the plan. The only misleading action which it attributes to J & J is the latter's silence and failure to act after the first IJDB proceeding was instituted. In that context, plaintiff states that J & J did not invoke the appeal procedures provided under the plan, and that it did not advise either plaintiff or the IJDB that it had not stipulated to the plan until after this suit was filed.[6] It hangs its claim of ratification of the plan upon those recited circumstances.

■ The argument evades the question whether J & J was legally obligated to take any action responsive to the IJDB proceedings. When faced with a claim that an arbitration award must be enforced, a court must first determine whether a contract exists by which the party sought to be charged has agreed to submit the matter in dispute to arbitration. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962); *United Steelworkers v. Warrior & Gulf Navigation*

---

**6.** Prior to the date when the IJDB rendered the award as to the phase III disputed work, J & J had answered count 1 of the complaint with a denial that it was a party to the plan, and had advised the IJDB by a mailgram that it was not a party to the plan.

*Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). No legal obligation to arbitrate a labor dispute can arise by operation of law. A party is compelled to submit his rights to arbitration only if he has contracted to do so. *Gateway Coal Company v. United Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). Without such agreement, the arbitrator obtains no jurisdiction over the person sought to be charged, and any award made is, as to such person, a nullity.

Finally, plaintiff invokes the principle stated in certain arbitration cases, that a party who acquiesces in procedural defects in a proceeding, is deemed to have waived, or to be estopped from asserting, that procedural variance against an arbitration award. *E. g., Krieter v. Lufthansa German Airlines*, 558 F.2d 966, 968 (9th Cir. 1977); *Order of Railway Conductors v. Clinchfield Railroad*, 407 F.2d 985, 988 (6th Cir. 1969). Such decisions are patently inapposite here. In those cases, the parties had submitted their persons to the jurisdiction of the arbitrator by their agreement to resort to arbitration.

It must be concluded that J & J was not a party to the plan, and that there is no factual basis which would support a determination that it had ratified the plan or that it is estopped from asserting its nonparty status.[7] It follows that the IJDB awards are void as to J & J.

Plaintiff chose the wrong forum. It could have submitted its claim to the disputed work to the NLRB under Section 10(k), without waiving any benefits to be derived under the plan should the NLRB have determined that all parties were found to the plan procedure. Having elected to follow that course, it cannot now rehabili-

tate its position in the absence of demonstrated facts sufficient to show that J & J was subject to the jurisdiction of the IJDB.

Accordingly, plaintiff's motion for summary judgment must be denied, and the motions of J & J and Local 111 for summary judgment must be allowed.

IT IS ORDERED, therefore, that summary judgment is entered dismissing the complaint.

---

7. Some element of detriment must also be shown to invoke the doctrines of ratification and estoppel. Plaintiff asserts detriment to itself in the premises because it relied upon J & J's action and chose not "to strike to coerce J & J to award it the disputed work." Strikes to resolve jurisdictional disputes are prohibited by the Labor Management Relations Act, except when the employer has assigned disputed work to one union in defiance of a valid, subsisting order which allocated the work to another un-

ion. 29 U.S.C. § 158(b)(4)(D). As to the initial proceeding before the IJDB, that argument espouses the novel theory that forebearance to commit an illegal act should be recognized as a legitimate detriment. The forebearance to strike may stand in a different light as to the second IJDB proceeding, if plaintiff was justified in assuming that the first IJDB award was valid. In the posture of this file, further pursuit of that distinction would be a fruitless endeavor.