**OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL 2, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civ. A. No. 81–2476.**

United States District Court, District of Columbia.

Nov. 15, 1982.

Joseph E. Finley, Cole & Groner, P.C., Washington, D.C., for plaintiff.

Robert J. Hickey, Peter G. Kilgore, Paul J. Kilgore, Kirlin, Campbell & Keating, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This case involves a bitter labor dispute between the defendant, Washington Metropolitan Area Transit Authority (WMATA), and the plaintiff, Local 2 of the Office and Professional Employees International Union (Local 2). In its First Amended Complaint, Local 2 asserts five causes of action: (1) breach of contract; (2) violations of the Metropolitan Area Transit Authority Compact (Compact)[1]; (3) malicious violation of an arbitration award; (4) unlawful retaliation against Local 2 employees; and (5) refusal of WMATA to proceed to arbitration on outstanding issues. The third cause of action—the most fiercely controverted—concerns the validity of an arbitration award establishing certain bargaining units among WMATA's employees. The fourth cause of action together with Local 2's motion for a temporary restraining order or preliminary injunction[2] concern WMATA's refusal to grant two pay increases to Local 2's members in October 1981 and in October 1982. Presently before the Court are cross motions for summary judgment on Local 2's third cause of action, Local 2's motion for summary judgment on its fourth cause of action and a motion for a temporary restraining order and preliminary injunction.

For the reasons set out in this opinion the Court determines that the arbitration award is valid and enforceable; that WMATA improperly withheld the pay increases from Local 2's members; and that the plaintiff is entitled to summary judgment on the third and fourth causes of action.

## BACKGROUND

The Metropolitan Area Transit Authority Compact includes provisions fashioned especially for WMATA and its employees. Though the parties are in sharp disagreement as to the application of those provisions to the facts, the essential and material facts are not in dispute.

For many years, certain employees of WMATA were represented for collective bargaining purposes by the Amalgamated Transit Union (Amalgamated). In early 1979, Local 2 notified WMATA that it had secured a majority of employee authorizations for collective bargaining purposes from the employees not represented by Amalgamated. WMATA refused to bargain, whereupon Local 2 filed an initial complaint in this Court, seeking recognition as a collective bargaining representative. Amalgamated was allowed to intervene in that proceeding.[3]

That action raised the issue of the proper composition of the bargaining units for WMATA's nonrepresented employees, and the proper representatives for those units. On June 13, 1979, WMATA and the two unions signed an agreement which provided that Local 2 would withdraw its action, and that the parties would negotiate among themselves over the issue of the appropriate bargaining units. A key clause of that agreement provided:

In the event that the Unions [Amalgamated and Local 2] and the Authority [WMATA] are unable to reach agreement on the composition of the Collective Bargaining Unit(s), by August 15, 1979, the Authority will submit the Unit question to arbitration pursuant to Public Law 92–349 [the Compact], before a *single arbitrator*.[4] (emphasis added)

This agreement, in calling for a single arbitrator, made reference to the Compact,

1. D.C.Code Ann. § 1–2431 (Art. XIV), as amended by the National Capital Transportation Act of 1972, P.L. 92–349, 86 Stat. 464.

2. Filed October 20, 1982.

3. *Office and Professional Employees International Union, Local 2 v. Washington Metropolitan Area Transit Authority,* Civil Action No. 79–1386, filed May 23, 1979.

4. Agreement of June 13, 1979, attached to Plaintiff's Memorandum of Points and Authori-

which provides for three arbitrators.[5] The reason for this change was the inability of the parties to conform precisely to the terms of the Compact. Under the Compact, one arbitrator was to be chosen by the union, a second by WMATA, and a third to be agreed upon by both the union and WMATA. However, because of conflict between the two unions, they could not agree upon one arbitrator. For that reason and at WMATA's suggestion, the three parties agreed upon a single arbitrator.

Local 2 then withdrew its prior action, and the parties, upon failing to reach an agreement concerning the proper composition of the collective bargaining units, submitted the dispute to the American Arbitration Association. By virtue of the June 13th agreement, only a single arbitrator, Seymour Strongin, heard the case. Extensive hearings were held, with the three parties participating. Within a month, on July 10, 1980, Arbitrator Strongin issued his award, dividing the employees by job classification into two bargaining units, one for professional employees, a second for clerical employees. He also decided the sharply contested question as to whether certain jobs should be excluded from the bargaining units because they were supervisory, managerial or confidential.

Following the award, Local 2 and WMATA made a number of changes, excluding certain employees who had been included by Arbitrator Strongin, while including others who had been excluded. The three parties then signed an election agreement providing for elections in the two established units. On December 16, 1980, in preparation for the elections, WMATA submitted to Local 2 and Amalgamated two voter eligibility lists, containing the names of the employees eligible to vote in each of the two units. The lists incorporated the findings of Arbitrator Strongin as to the proper composition of each unit, as well as the subsequent changes agreed upon by Local 2 and WMATA. All parties accepted the eligibility lists which then constituted the basis for the elections.

In elections held in January 1981, Local 2 was certified as the winner in both units. Subsequent negotiations were held for yet further changes in the composition of the bargaining units, but no agreement was reached.

Anticipating the upcoming bargaining sessions, Local 2 held elections among its employees in order to select members for its negotiating committees. Twelve employees, six from each unit, were selected, and contract proposals were submitted to WMATA.

Because of the appointment of Richard Haddad as the new negotiator for WMATA, the bargaining sessions did not begin until September 1981. At the outset of the negotiations, WMATA contested the arbitrator's award; Local 2's status as the employees' proper bargaining representative; and the union status of approximately 300 employees—about 60 percent of Local 2's total membership of 500—claimed by WMATA to be supervisory, managerial or confidential. Ten of the 12 members of Local 2's two bargaining committees were among the 300 challenged by WMATA. When WMATA requested arbitration before three arbitrators for resolution of these issues, Local 2, claiming that these issues had already been resolved by Arbitrator Strongin, filed this suit on October 13, 1981.

In the same month, WMATA granted a cost of living wage adjustment, an increase of 7.7 percent, to all its nonrepresented employees. It withheld the increase from all of Local 2's members, claiming that the increase was subject to collective bargaining with Local 2.

ties in Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment (filed November 15, 1981).

5. Section 66(c) of the Compact provides:

In case of any labor dispute involving the Authority and such employees where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority.

In its attempt to exclude from Local 2 the 300 employees claimed to be supervisory, managerial or confidential, WMATA sent a letter to these employees in December 1981 stating "that as a supervisory/managerial employee, you are not eligible to participate in union activities . . . . Accordingly, you are instructed to stop all involvement, if any, in Local 2's affairs immediately, and you are advised that failure to do so may result in your termination."[6] The letter further provided that an employee believing that WMATA's determination regarding his or her status was incorrect should contact WMATA within two weeks.

WMATA then proceeded to treat the recipients of the letter as nonrepresented employees, and therefore granted them the 7.7 percent increase. It withheld the increase from six recipients who contested their exclusion from the union.

In October 1982, WMATA granted a second cost of living adjustment. That increase of 6.18 percent was withheld from the remaining members of Local 2, including the six who had protested their status the prior year. The employees who had been excluded from Local 2 by the letter of December 1981, except for the six who protested their exclusion, received the second increase.

Based on the above recital of material and undisputed facts the Court will present in the succeeding sections of this Opinion an analysis of the parties' contentions as to the plaintiff's third and fourth causes of action.

## ANALYSIS

### A.

### THE THIRD CAUSE OF ACTION

In the third cause of action Local 2 requests the Court to confirm Strongin's arbitration award and the subsequent elections, claiming that WMATA's refusal to recognize it as the collective bargaining representative for the two units violates section 66(b) of the Compact.[7] Local 2 also asks that WMATA be enjoined from requesting any change in the bargaining units as found by the arbitrator and as amended by the parties prior to the election.

WMATA presents a number of arguments in opposing Local 2's motion for summary judgment. It claims that this Court is without jurisdiction to enforce the arbitration award; that the award is void, since it was rendered by only one arbitrator, rather than the three provided for in the Compact; that the changes to the award agreed upon by Local 2 and WMATA after the award but before the election render the award invalid; and finally, that the award is invalid because it included supervisory, managerial and confidential employees, who by law should be excluded from the bargaining units.[8] In its cross motion WMATA asks the Court to declare the arbitrator's award invalid; that negotiations concerning the proper composition of the bargaining units begin anew, and that any impasse in those negotiations be resolved by an entirely new arbitration panel of three arbitrators.

---

**6.** Letter of Richard S. Page, WMATA's General Manager, dated December 23, 1981, attached to plaintiff's Motion for Preliminary Injunction (filed January 20, 1982).

**7.** Section 66(b) provides:

The Authority shall deal with and enter into written contracts with employees as defined in section 152 of title 29, United States Code, through accredited representatives of such employee or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours, working conditions, and pension or retirement provisions.

**8.** Early in the proceedings four WMATA employees were allowed to intervene. They included three attorneys in WMATA's General Counsel's Office and an engineer, all currently classed within Local 2. The three attorneys were placed in Local 2 by the arbitrator's award, while the engineer was placed in the unit by agreement of WMATA and Local 2 after the rendering of the award. The intervenors claim that they are exempt under the Compact from being subjected to compulsory collective bargaining, and ask that they not be included in Local 2.

Local 2 contests the several arguments advanced by WMATA and adds that WMATA's efforts to have the award declared invalid are barred by the statute of limitations.[9]

### 1. Jurisdiction

WMATA's initial claim is that this Court lacks jurisdiction to enforce the award of Arbitrator Strongin, even if valid. Because § 66(c) makes no provision for enforcement, it argues that the only sanction is the force of public opinion. In substance, the argument is that the award is nothing more than an advisory opinion.

■ This emasculating view of the Compact should be rejected. As Local 2 points out, the legislative history of the Compact clearly articulates congressional intent that the courts be available to enforce any award.

> In the event that either party to a dispute refuses to use the arbitration procedures or to accept the decision of the arbitration board, the other party will have the equitable remedy of making application for injunctive relief to the courts and any further violation of the provisions of the compact could be enjoined by court order.

S.Rep. No. 931, 92d Cong., 2d Sess. 9 (1972). *Accord* H.R.Rep. No. 1155, 92d Cong., 2d Sess. 9. *See, Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 720–21, 65 S.Ct. 1282, 1288–1289, 89 L.Ed. 1886 (1945) (rejecting a similar claim made in connection with an arbitration award under the Railway Labor Act).

WMATA attempts to buttress its contention by citing the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.,* which removes from federal courts the jurisdiction to issue any injunction in a case involving a labor dispute. 29 U.S.C. § 101. A similar argument was made and rejected in *San Francisco Electrical Contractors Association, Inc. v. International Brotherhood of Electrical Workers, Local 6,* 577 F.2d 529 (9th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978). The court there, in enforcing an arbitration award rendered in a labor dispute, held that the provisions of the Norris-LaGuardia Act do not remove from federal courts the jurisdiction to enforce arbitration awards. The fact that the jurisdictional predicate there was § 301 of the Labor Management Relations Act (Taft-Hartley Act), 29 U.S.C. § 185, while here it is the jurisdictional provision of the Compact, D.C.Code § 1–2433, has no effect on the inapplicability of the Norris-LaGuardia Act.[10]

This Court has jurisdiction to enforce the arbitration award.

### 2. Standard of Review

Despite the voluminous pleadings in this proceeding, the question of the standard of review to be employed was not adequately addressed. Section 66(c) of the Compact provides that arbitration awards shall be "final and binding on all matters in dispute." There are no explicit provisions in the Compact for judicial review of these "final and binding" awards. Thus, the Court must decide what standard of review it should apply in reviewing the arbitrator's "final and binding" determination.

■ As an initial matter, it may be stated that plenary review on the merits is barred by the Compact's language. *See, e.g., United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 594, 598–99, 80 S.Ct. 1358, 1361–1362, 4 L.Ed.2d 1424 (1960) (arbitrator's award deciding labor dispute not subject to plenary review, under contract which provided that arbitrator's decision be "final and binding"). *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) ("courts . . . have no business weighing the merits of the grievance" when the grievance has

---

9. In light of the conclusions contained in this Memorandum Opinion the statute of limitations issue need not be reached.

10. Other cases enforcing arbitration awards resolving labor disputes are too numerous to mention. *See* 6 Kheel, *Labor Law* § 24.05[1]–[2] (1982), and cases cited therein.

been decided by a Board of Arbitration whose decision is "final and conclusively binding" by contract). Otherwise, if the courts were free to review the merits of the awards *de novo,*

> arbitration as the structure for industrial peace supplanting the usual processes for court adjudication would itself be supplanted by the judicial machine at the time it would count the most—that is, at the moment an arbiter's award was sought to be enforced.

*Safeway Stores v. American Bakery & Confectionary Workers International Union, Local III,* 390 F.2d 79, 82 (5th Cir.1968).

However, that does not mean that this Court is reduced to an unquestioning mechanism for the enforcement of arbitration awards. The Supreme Court has repeatedly held that there remains some room for review of arbitration awards in labor cases, even when those awards have been denominated "final and binding" either by contract or statute. For example, in *Enterprise Wheel and Car, supra,* the Supreme Court, while stressing the narrow scope of review, indicated that an arbitrator's award is valid only so long as it "draws its essence" from its source of authority (in that case, a collective bargaining agreement). "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* 363 U.S. at 597, 80 S.Ct. at 1346.

■ To aid in delineating the precise standards to be applied in the review process, the provisions of the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188, are helpful and serve as a guide. The RLA contains provisions for voluntary arbitration of some labor disputes, compulsory arbitration of others. *Elgin, Joliet & Eastern Ry.,* 325 U.S. at 722–28, 65 S.Ct. at 1289–1292. The awards rendered in disputes resolved by compulsory arbitration are, by the terms of the RLA, "final and binding". 45 U.S.C.

§ 153 First (m). On review these arbitration awards are subject to a standard of review described as "among the narrowest known to the law." *United Steelworkers of America v. Union Railroad Company,* 648 F.2d 905, 910 (3rd Cir.1981), quoting *Diamond v. Terminal Railway Alabama State Docks,* 421 F.2d 228, 233 (5th Cir.1970). *See Union Pacific Railroad v. Sheehan,* 439 U.S. 89, 93–94, 99 S.Ct. 399, 402–403, 58 L.Ed.2d 354 (1978). This very narrow scope of review of "final and binding" awards under the RLA is limited by 45 U.S.C. § 153 First (q) to three specific grounds: (1) failure of the award to comply with the requirements of the RLA; (2) failure to confine itself to matters within its jurisdiction; and (3) fraud or corruption. *Union Pacific* at 93, 99 S.Ct. at 402.[11] Because both the RLA and the Compact provide for compulsory arbitration and both denominate the resulting award as "final and binding", the Court adopts the standards of the RLA for its review of the award at issue here. Specifically, the Court will examine the award to see whether it complies with the requirements of the Compact, and to see whether it confines itself to matters within its jurisdiction.[12]

### 3. Validity of the Strongin Arbitration Award

WMATA contends that the Strongin award, because rendered by a single arbitrator, is contrary to the Compact and therefore null and void as an illegal contract. It correctly points out that § 66(c) of the Compact provides for compulsory arbitration before three, not one, arbitrators. And in response to Local 2's argument that it signed an agreement to submit the dispute to one arbitrator, WMATA cites *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), for the proposition that even a party to an illegal contract may raise its illegality as a

---

11. These grounds are similar to those adopted by the courts for review of arbitration awards rendered pursuant to contractual, rather than statutory, provisions. *See* 6 Kheel, *Labor Law* at § 24.05[2]. The Court notes that its conclu-

sion in this case would not differ if it applied the standards summarized in Kheel, *id.,* rather than those set forth in the RLA.

12. Fraud or corruption is not alleged here.

defense in proceedings brought for enforcement of the contract.

■ The Court holds, however, that under the circumstances here, where WMATA voluntarily proceeded before one arbitrator, it waived any right to object to any lack of compliance with the Compact. *See, Order of Railway Conductors v. Clinchfield Railroad Company,* 407 F.2d 985, 988–89 (6th Cir.) *cert. denied,* 396 U.S. 841, 90 S.Ct. 104, 24 L.Ed.2d 92 (1969). In *Clinchfield,* a dispute arose which was subject to voluntary arbitration under the Railway Labor Act. The RLA provides that such disputes subject to voluntary arbitration should be before an arbitration panel of three or six members. 45 U.S.C. § 157 First. Instead of empaneling such a board, the parties voluntarily submitted the dispute to a board of five arbitrators. After an adverse determination, the unions sought to vacate the award because of this variance from the statute. However, the Sixth Circuit confirmed the award, holding that the unions "waived their right to object to the statutory departure by participating in the arbitration proceedings without objection on this point." *Id.* at 989.

Similarly here, WMATA waived any defect concerning the single arbitrator by participating in the arbitration proceedings without objection. Indeed, it was WMATA that initially suggested proceeding before a single arbitrator when the difficulty of complying with the Compact's directive became clear. WMATA then signed an agreement which provided for a single arbitrator; signed the election agreement; and finally submitted voter eligibility lists which incorporated the findings of the arbitration award. All these actions reflected a knowing waiver of any right WMATA had to insist upon three arbitrators. Moreover, if the award were invalidated, the parties might be unable to comply with the Compact's terms. Conceivably, Local 2 and Amalgamated may find it impossible to ever agree upon a single arbitrator to represent the employees.

WMATA attempts to distinguish *Clinchfield* by underlining the fact that it dealt with voluntary arbitration pursuant to contract, while the present case deals with compulsory arbitration mandated by the Compact. Because arbitration in *Clinchfield* was voluntary and the parties were free to refrain from arbitration altogether, WMATA argues that they could subsequently agree to arbitrate before a number of arbitrators different than that provided by the RLA. Here, however, because arbitration under the Compact is compulsory, WMATA claims that the parties were precluded from contracting for arbitration before a number of arbitrators other than the three prescribed by statute.

That distinction misses the mark entirely. Both the RLA and the Compact prescribe a certain number of arbitrators for the arbitration cases which arise under their provisions. The RLA, 45 U.S.C. § 157 First, invests the party governed by its provisions with the freedom to decide only whether to arbitrate, not with the freedom to decide upon the number of arbitrators. In terms of the number of arbitrators, the RLA's command is as forceful and unequivocal as that of the Compact. Thus, the doctrine of waiver enunciated in *Clinchfield* is equally valid for the Compact.[13]

WMATA insists that *Kaiser, supra,* forbids the enforcement of such a waiver. In *Kaiser,* a union and a coal company entered into a contract which allegedly ran afoul of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 8(e) of the Taft-Hartley Act, 29 U.S.C. § 158. The contract required the coal company to contribute a certain amount of money to union welfare funds per ton of coal, even for coal that the company chose to purchase, rather than

---

**13.** Interestingly, in *Clinchfield* the reason for the parties' departure from the RLA's terms was quite similar to the reason for the departure here. The parties in *Clinchfield* contemplated three arbitrators, but there were two unions who could not agree upon one arbitrator. The railroad chose one, each union chose one and the mediation board named a neutral arbitrator. Following the designation of two members by the unions, the railroad named a second, for a total of five. 407 F.2d at 487–88.

mine. When the union sought to enforce the agreement, the Supreme Court held that if the contract did violate the Sherman Act or Taft-Hartley Act, then the contract would be unenforceable. Even though the coal company signed the contract, it could raise the contract's illegality as a defense. 102 S.Ct. at 856. WMATA claims that the agreement it signed to arbitrate before one arbitrator is contrary to the Compact, and therefore, like the contract in *Kaiser*, is illegal and unenforceable.

*Kaiser* brings into focus the real difficulty requiring explanation: when does an agreement seemingly contrary to statute constitute an enforceable waiver as in *Clinchfield*, and when does such an agreement constitute an unenforceable, illegal contract as in *Kaiser?*

The solution, simple in its articulation yet often complex in its application, lies in the nature and strength of any public interest implicated by the statute in question. There is little question that one is free to waive the provisions of a statute or even the constitution when those provisions accord the individual a private right, and where waiver of that right would not affect the public welfare. 28 Am.Jur.2d, Estoppel and Waiver §§ 161–68 (1966); 92 C.J.S. Waiver at pp. 1066–68 (1955). However, when the provisions of the statute in question go beyond the rights of an individual to implicate the public interest, then an agreement contrary to the statute's provisions constitutes an illegal contract, not a waiver. The determination of whether a statute accords a freely waivable, private right, or whether it implicates the public interest in a manner forbidding contrary contracts, is to be made with reference to congressional intent. The Supreme Court articulated that point in *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945):

> Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to

effectuate. With respect to private rights created by a federal statute, ... the question of whether the statutory right may be waived depends upon the intention of Congress as manifested in the particular statute (footnote omitted).

324 U.S. at 704–705, 65 S.Ct. at 900–901.

*Kaiser* exemplifies the type of contract which is illegal because it implicates the interests of the general public and not just the individual interests of the union and coal company that signed the contract. The congressional intent behind the two statutes at issue there is very clear. The coal company claimed that both the Sherman Act and the Taft-Hartley Act precluded enforcement of the contract. The Sherman Act provides that every contract in restraint of trade is illegal and that any person making such a contract is guilty of a felony. Similarly, the Taft-Hartley Act provides that a contract made contrary to its provisions shall be unenforceable and void.

Obviously, Congress felt that the public interest precluded any contract contrary to those two statutes. The statutes do not confer simple private rights, to be freely waived by the individuals without regard to the public interest. For that reason, the coal company was permitted to raise the defense of illegality, despite the fact that it had admittedly signed the contract sued upon. This was clearly recognized in *Kaiser* when it was noted:

> The Court refuses to enforce such a contract and it permits the defendant to set up its illegality, not out of any regard for the defendant who sets it up, *but only on account of the public interest* (emphasis added).

102 S.Ct. at 856, quoting *McMullen v. Hoffman*, 174 U.S. 639, 669, 19 S.Ct. 839, 850, 43 L.Ed. 1117 (1899).

The policy behind the Compact is of a different sort. The Compact's statutory intent was to provide the most efficacious means for "peaceful settlement of all labor disputes", S.Rep. No. 931, *supra*, p. 7, so as to prevent work-stoppages which would disrupt transit services. Prior to the adoption

of section 66(c) of the Compact, WMATA and its unions had by contract provided for arbitration before three arbitrators. The legislative decision to incorporate into statute those contractual rights was based on the "agreement of all interested parties" i.e., both WMATA and its unions, and on past experience proving that "voluntary agreement of such final and binding arbitration has proved to be successful in resolving impasses between the parties." *Id.*

■ Thus, the Compact conferred upon the parties the private right to insist upon three arbitrators, because the parties themselves had agreed that such a right would promote labor peace. The inescapable conclusion is that if the parties agree upon other means for preserving peace, especially when section 66(c) is unable to preserve that peace, then there would exist no difficulty in waiving that right provided by the Compact. The public interest is concerned only with promoting agreement between WMATA and its unions, not with any particular procedural mode calling for three arbitrators.

■ But, even if there does exist a public interest in adhering strictly to the Compact's provisions, that fact does not automatically render the agreement unenforceable. Some illegal contracts, upon a balancing of the interests involved, may be enforceable.

Out of the muddle of common law rules regarding illegality has come the general principle that illegal contracts are unenforceable only where (1) a statute explicitly provides that contracts contravening it are void or (2) where the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

*California Pacific Bank v. Small Business Administration,* 557 F.2d 218 (9th Cir.1977), citing a tentative draft of what is now Restatement 2d of Contracts § 178 (1981).[14] In the Compact there exists no term which "explicitly provides that contracts contravening" its provisions for three arbitrators "are void." Thus, one may resort to the balancing test of the Restatement 2d to determine the agreement's enforceability.

■ Local 2 was reasonably justified in the expectation that WMATA would abide by the agreement to proceed before one arbitrator. As a result of arms-length bargaining, and as a result of the difficulty in complying with the Compact's directive, WMATA, Local 2 and Amalgamated signed the troublesome agreement. It was a practical solution to a difficult situation and involved no misconduct of any sort. Moreover, if enforcement were denied, the forfeiture resulting to the union would be great. Local 2 would be forced to relitigate the adjudicated issues and suffer further delay before being able to bargain as the unchallenged and certified representative. Finally, even if there does exist a public policy that would be furthered by unwavering adherence to section 66(c) of the Compact, that public policy would be outweighed by the public interest in speedily resolving labor disputes, by means agreeable to labor and management.

---

14. Restatement 2d of Contracts § 178, also cited in its draft version in *Jackson Purchase v. Local Union 816,* 646 F.2d 264, 267 (6th Cir. 1981), provides:

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.
(2) In weighing the interest in the enforcement of a term, account is taken of
 (a) the parties' justified expectations,
 (b) any forfeiture that would result if enforcement were denied, and

 (c) any special public interest in the enforcement of the particular term.
(3) In weighing a public policy against enforcement of a term, account is taken of
 (a) the strength of that policy as manifested by legislation or judicial decisions,
 (b) the likelihood that a refusal to enforce the term will further that policy,
 (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
 (d) the directness of the connection between that misconduct and the term.

In sum, the Court holds that the right to appoint three arbitrators as provided by the Compact could be freely waived with the consent of both parties, and that any award resulting from such waiver should be enforced. Even if the agreement is considered illegal, it falls within the class of agreements that are nonetheless enforceable.

### 4. Validity of the Award's Inclusion of Supervisory, Managerial or Confidential Employees

WMATA further contests the inclusion within Local 2 of employees which it claims are supervisory, managerial or confidential. WMATA contends that approximately 300 employees which Local 2 claims to represent by virtue of the award were improperly included by the arbitrator within the union.

This issue was determined by the arbitrator. The question as to which employees were supervisory, managerial or confidential was fully aired and carefully considered by the arbitrator. If the Court were to decide this issue, it would be engaging in plenary review of the arbitrator's decision on the merits. The Court will limit itself to the question of whether this issue was within the arbitrator's jurisdiction. If it was, then the resulting decision will be enforced without further review by this Court.

 Section 66(c) of the Compact provides that "any labor dispute" which does not result in agreement shall go to arbitration. Labor dispute is defined to include "questions concerning representation." *Id.* Because the question of whether certain employees were supervisory, managerial or confidential is a "question concerning representation," the issue was within the arbitrator's jurisdiction. It will not be reviewed by this Court.

### B.

### THE FOURTH CAUSE OF ACTION

In its fourth cause of action, Local 2 charges that WMATA unlawfully withheld from its members the cost of living wage adjustments which WMATA granted to its nonrepresented employees in October 1981 and October 1982. Local 2 claims that the failure to grant the adjustments amounted to a violation of section 66(b), which requires WMATA to "deal with" its unions. In its motion for summary judgment and its motion for temporary and preliminary injunctive relief, it asserts that WMATA was obligated to grant the two wage increases and therefore this Court should order retroactive increases to Local 2's members. WMATA strongly disagrees, claiming that those increases should remain subject to collective bargaining or future arbitration.

 *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), states that an employer cannot unilaterally change conditions of employment during the course of negotiations with its union. Any such change would amount to a failure "to bargain collectively"—i.e., in good faith—as required by section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). *Katz,* 369 U.S. at 743, 82 S.Ct. at 111. Thus, an employer with a policy of granting automatic wage increases would have to continue such a policy even during negotiations, unless the employer notified the union that it wished to make a change in those existing conditions of employment, and gave the union an opportunity to bargain over the change. *NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1189 (D.C.Cir.1981). *See Plasticrafts, Inc. v. NLRB,* 586 F.2d 185, 188 (10th Cir.1978).

 This obligation to continue a prior policy of granting automatic wage increases is also imposed by the Compact. Moreover, although WMATA argues otherwise, such increases were a standing and long-existing policy at WMATA, and at no time was Local 2 afforded the opportunity to bargain over the matter. Under the circumstances, WMATA should be required to grant the two cost of living wage adjustments to the plaintiff's members.

Under § 66(b), the obligation imposed upon WMATA is to "deal with" its employees, while under the National Labor Relations Act it is to "bargain collectively."

Still, despite this difference in language, the obligation to bargain in good faith is as integral a part of the Compact as it is part of the National Labor Relations Act. It cannot be imagined that Congress intended to free WMATA from the universally imposed constraint of bargaining in good faith.

■■■ WMATA cites *NLRB v. Cabot Carbon,* 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959) in favor of its contention that the phrase "deal with" imposes no obligation to bargain in good faith. There, the Supreme Court held that the term "deal with" is not synonymous with "bargain collectively"; rather, it is a more expansive term, encompassing certain contacts not generally part of the collective bargaining process. *Id.* at 210–14, 79 S.Ct. at 1020–1022. Thus, the Court held that although the narrow contact of certain employee committees with the employer did not amount to "collective bargaining", nonetheless those committees still fell within the description of labor organizations which "deal with" the employer, as understood by § 2(5) of the National Labor Relations Act. 29 U.S.C. § 152(5). But nothing in *Cabot Carbon* indicates that when the parties do enter into negotiations traditionally part and parcel of the collective bargaining process, that the words "deal with" would relieve the parties of the responsibility of bargaining in good faith. The term "deal with", by including certain exchanges between employer and employees which are *outside* the normal collective bargaining process, was not intended to wreak havoc with the principles of good faith governing negotiations over items *inside* the usual realm of collective bargaining. Thus, the use of the term in the Compact serves to broaden, rather than narrow, the range of responsibilities imposed upon WMATA.

Indeed, the Compact itself also uses the term "collective bargaining", and thereby affixes the term's good-faith component upon WMATA and its employees. D.C. Code § 1–2414, in discussing the effect of the Compact on other laws, provides "that nothing herein shall be deemed to render inapplicable any laws of the United States ... relating to ... *collective bargaining* between [WMATA] and [its] employees ... including, but not limited to, the Labor-Management Relations Act, 1947 as amended (29 U.S.C. § 141 *et seq.*)" (emphasis added). In light of this obligation to bargain collectively in good faith, WMATA must pass along to Local 2's members any automatic increase in wages granted pursuant to an established policy.

WMATA alternatively argues that there does not, and never had, existed a

> practice and policy of granting a cost of living adjustment (COLA) increases annually during the month of October. Rather, the decision whether or not any employees will receive a COLA increase, the amount, and which employees will receive it, is made on a year by year basis and there is no vested right to receive it.[15]

The result, according to WMATA, is that even if the obligation to bargain in good faith exists under the Compact, WMATA need not grant the adjustments because they were not automatic.

Despite WMATA's effort to create an issue of fact, the Court finds that such an issue does not exist. It is undisputed that on May 3, 1979, WMATA's Board of Directors "formally adopted an annual salary adjustment policy" for nonrepresented salaried employees. Based on that policy, a 7.7 percent adjustment was made, effective October 17, 1981.[16] On October 14, 1982, in announcing the 1982 adjustment, Richard Page, WMATA's General Manager, wrote in a staff notice for distribution to WMATA's nonrepresented employees: "in accordance with a cost of living adjustment

---

15. Defendant's Statement of Genuine Issues of Fact, Fourth Cause of Action at ¶ 1 (filed November 16, 1981), attached to Defendant's Opposing Statement of Points and Authorities to Plaintiff's Motion for Partial Summary Judgment.

16. Memorandum of Carmen E. Turner, dated September 9, 1981 (filed October 13, 1981), attached to the original Complaint.

policy and formula adopted several years ago, the Board of Directors today approved a salary increase in the amount of 6.18 percent." [17]

Given the policy as stated by WMATA's officers, the Court finds, as a matter of law, that there is no factual issue regarding the existence of such a policy which could be submitted to a trier of fact.

■ Lastly, WMATA claims that it was prepared at all times to bargain with Local 2 over this issue of the salary adjustments. If that were true, WMATA need not grant even an automatic increase based on an established policy. *Blevins Popcorn,* 659 F.2d at 1189. *See Katz,* 369 U.S. at 746, 82 S.Ct. at 1113. However, it is undisputed that WMATA recognized neither the legitimacy of Local 2 nor the union status of ten of the 12 members on Local 2's bargaining committees. These ten received the letter threatening termination if they involved themselves in union activities. Thus, regardless of any willingness of WMATA to discuss the adjustments, WMATA's threat negates the claim that it was prepared to truly negotiate the issue in good faith. Negotiation in good faith is not so broad as to include WMATA's preparedness to talk with Local 2 after hanging the proverbial sword of Damocles over the heads of Local 2's negotiators.

In sum, all the elements requiring the granting of the adjustments are present here: the Compact requires the granting of automatic raises granted pursuant to an existing policy; there existed such a policy as evidenced by WMATA's own memoranda; and WMATA refused to negotiate with Local 2 in good faith concerning the adjustments.

On the basis of the foregoing, an appropriate Order granting summary judgment to the plaintiff on the third and fourth causes of action will be entered.

17. Staff Notice of Richard S. Page, dated October 14, 1982 (filed October 20, 1982), attached to plaintiff's Motion for a Temporary Restraining Order or Motion for a Preliminary Injunction.