724 F.2d 133
 115 L.R.R.M. (BNA) 2210, 233 U.S.App.D.C. 1
 OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL
2, Plaintiff-Appellee,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant-Appellant,
William B. Bircher, et al., Intervenor.
OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL
2, Plaintiff-Respondent,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
Defendant-Petitioner.
OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL
2, Appellee,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.
Appeal of William B. BIRCHER.
OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL
2, Appellee,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.
Appeal of Alan D. PECK.
 Nos. 82-2423, 82-2443, 82-2488 and 82-2500.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 31, 1983.
Decided Dec. 20, 1983.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 81-02476).
 James J. Kelley, Washington, D.C., with whom William J. Curtin and Terence P. McCourt, Washington, D.C., was on brief for appellant, Washington Metropolitan Area Transit Authority.
 William B. Bircher, pro se, for appellant in No. 82-2488.
 Alan D. Peck, pro se, for appellant in No. 82-2500.
 Joseph E. Finley, Washington, D.C., for appellee.
 Before WALD, MIKVA and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 The central issue in this appeal is the enforceability of an arbitral award rendered under the Washington Metropolitan Transit Authority Compact. In June 1980, the Office and Professional Employee International Union, Local 2 (Local 2 or Union) and the Washington Metropolitan Area Transit Authority (Authority or WMATA) submitted to an arbitrator questions concerning the scope of a bargaining unit. One month later, the arbitrator issued an award that divided employees by job classification. Following the award, Local 2 and WMATA continued negotiations, elections were held, and Local 2 was certified as the winner. Nonetheless, the parties continued to disagree as to the proper scope of the bargaining unit. In October, 1981--sixteen months after the arbitrator's decision--the Union filed this suit demanding, inter alia, specific enforcement of the decision.
 
 
 2
 Shortly after this case was filed in the district court, a number of individual WMATA employees intervened. Of the original intervenors, only Bircher and Peck remain involved in the case. Both employees argue that they should not be included within the unit.
 
 
 3
 The district court, 552 F.Supp. 622, in November 1982, granted partial summary judgment in favor of the Union. The district court, applying a highly deferential standard of review, decided, inter alia, that the arbitral decision was enforceable.
 
 
 4
 Following oral argument, and considering the urgency of the matters involved, we entered a judgment on June 7, 1983 that affirmed the trial court's decision to enforce the arbitrator's award, 713 F.2d 865. We reserved judgment as to the issues raised by intervenors Bircher and Peck. In this opinion, we explain the rationale that led to our order of affirmance. Additionally, we dismiss, without prejudice, the appeals of intervenors Bircher and Peck.
 
 I. BACKGROUND
 
 5
 The Washington Metropolitan Transit Authority Compact (Compact) created WMATA. The Compact, authorized by Congress, is an interstate agreement between the District of Columbia, the Commonwealth of Virginia, and the State of Maryland. Pub.Law No. 92-349, 86 Stat. 464, amending Pub.Law No. 89-774, 80 Stat. 1324. See also D.C.CODE ANN. Sec. 1-2431 (1981). The Compact authorizes WMATA to construct, operate, and develop a mass transit system in the Washington Metropolitan Area. In a provision central to this appeal, the Compact also requires that all labor disputes be submitted to arbitration.
 
 
 6
 For many years, Amalgamated Transit Union (Amalgamated) has represented certain groups of WMATA employees. In early 1979, Local 2 began its efforts to become the representative of the nonrepresented employees. Specifically, Local 2 hoped to unionize the professional, administrative, technical, and clerical employees. After Local 2 demanded recognition as the bargaining representative and WMATA refused to bargain, Local 2 filed suit in OPEIU Local 2 v. WMATA, Civil Action No. 79-1386 (D.D.C.1979). Amalgamated intervened. In June 1979, Local 2 withdrew the suit and the three parties--Local 2, Amalgamated, and WMATA--entered an agreement which provided for negotiations on the composition of the bargaining unit. The agreement also established that, if the parties failed to reach an understanding, "the Authority [would] submit the unit question to arbitration pursuant to [the Compact], before a single arbitrator."
 
 
 7
 The parties met and reached agreement as to the placement of certain employee classifications inside or outside the bargaining unit. The parties, however, were unable to resolve all the issues and thus submitted more than 120 job classifications to the arbitrator. The arbitrator was to determine which, if any, employee classifications were composed of supervisory, managerial, or confidential jobs. Pursuant to statute and the parties' submission, employees who were characterized as confidential, supervisory, or managerial would not be placed within the unit. On July 10, 1980, the arbitrator rendered an award that provided a list with the word "in" or "out" following each job category. The arbitrator noted:
 
 
 8
 [I]t would protract this decision to unreasonable length if the Arbitrator were to state even briefly the facts and rationale covering each position. In lieu of such discussion the Arbitrator will list each job, by number and title and his ruling (included or excluded). With respect to each such holding the Arbitrator is prepared, upon joint request of the parties, to set forth in a supplementary decision the reasons underlying his ruling.
 
 
 9
 Appellant's Appendix at 7. Neither party requested any supplemental decisions.
 
 
 10
 After the award, the parties again met. The parties modified some of the specific job classification holdings of the arbitrator's award and discussed the placement of other classifications. In November 1980, the parties entered an election agreement. WMATA submitted to the Union a list of employees eligible to vote. The list reflected the arbitrator's job classifications, as modified by the subsequent agreements between the parties. The Union alleges that at this time all issues were resolved. Appellee's Brief at 7. The Authority, however, suggests that complete agreement had not been reached. Appellant's Brief at 5, 6. In any event, elections were held in January 1981, and two bargaining units voted for Local 2 representation.
 
 
 11
 In April, three months after the election, the Authority again expressed concerns over the bargaining unit composition. Matters were further complicated by a June 1981 administrative reorganization in WMATA. The reorganization affected the job responsibilities of many individuals whom the arbitrator had placed within the bargaining unit.
 
 
 12
 In July 1981, the Union submitted a comprehensive written proposal for collective bargaining. The appointment of a new negotiator for WMATA, however, delayed the bargaining sessions until September. WMATA immediately thereafter contested the placement of numerous employee classifications, and requested arbitration over the composition of the bargaining unit. Claiming that these issues already had been resolved by the earlier arbitral award, Local 2 refused to enter renewed arbitration. Shortly thereafter, Local 2 filed this suit seeking, inter alia, enforcement of the arbitrator's award.
 
 
 13
 Although the parties made efforts to negotiate subsequent to the commencement of this litigation, no progress was made. In December 1981, almost one year after the election, the Authority "closely scrutinized the composition of the bargaining unit because of its concerns that managerial and supervisory employees were engaged both in organizational and negotiation activities on behalf of the union." Appellant's Brief at 9. Following this "close scrutiny" of the unit, the Authority's General Manager sent a letter to approximately 300 employees within the bargaining unit. Among the 300 recipients were ten of the twelve members of the Union's bargaining team. The letter stated in pertinent part:
 
 
 14
 As a result of a recent evaluation of your classification, we have determined that as a supervisory/managerial employee, you are not eligible to participate in union activities. Participation includes, but is not limited to, attending union meetings, holding union positions of any type, participation in the negotiation or administration of any contract on behalf of the union, and representing the union in any grievance or legal proceeding.
 
 
 15
 ....
 
 
 16
 Accordingly, you are instructed to stop all involvement, if any, in Local 2's affairs immediately, and you are advised that failure to do so may result in your termination.
 
 
 17
 If you have any questions on your status as a supervisory/managerial employee ... please contact [a designated WMATA official].
 
 
 18
 Appellant's Appendix at 100. Six employees objected to the letter and were allowed to remain in the bargaining unit.
 
 
 19
 In November 1982, the district court granted partial summary judgment for the Union. The only issue which remains in controversy is whether the arbitral award is enforceable. In this appeal, WMATA challenges the district court's choice of a standard of review and, more generally, argues that the arbitrator's award should not have been enforced. Intervenors Bircher and Peck similarly appeal the district court's decision.
 
 II. ANALYSIS
 
 20
 This is a case of first impression in this circuit. We are asked to delineate the proper scope of judicial review of arbitral decisions rendered under the Washington Metropolitan Transit Authority Compact. In addressing this issue, we are mindful of the somewhat unique role the Compact arbitrator must fulfill, for the Compact requires arbitration of issues normally within the province of the National Labor Relations Board. Nonetheless, we must not lose sight of the central function which labor arbitration performs in the maintenance of industrial peace.
 
 A. Standard of Review
 
 21
 It cannot be gainsaid that federal policy favors the peaceful resolution of labor disputes through arbitration. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 46, 94 S.Ct. 1011, 1018, 39 L.Ed.2d 147 (1974). We would startle no one by recognizing arbitration as a preferred method to resolve industrial strife quickly and inexpensively. As we recently noted: "[A]rbitration of [labor] disputes is faster, cheaper, less formal, more responsive to industrial needs, and more conducive to the preservation of ongoing employment relations than is litigation." Devine v. White, 697 F.2d 421, 435 & n. 66 (D.C.Cir.1983).
 
 
 22
 Arbitration is efficacious because a "principal characteristic of the common law of arbitration is judicial deference to arbitral decisions." Id. at 435. If parties to arbitration could freely relitigate their complaints in the courts, arbitration would cease to be a method to achieve prompt resolution of conflict, but would instead become a new layer of review, and a new cause for delay. To illustrate the delay occasioned by judicial review, we need only note that the arbitral decision in the instant case was released over three years ago. Accordingly, we review an arbitral decision with the presumption that the common law standard of deference applies. The case must present egregious deviations from the norm before we will abandon the firmly-established principle of deference.
 
 
 23
 Appellant urges us to apply a totally different standard of review because of the nature of Compact arbitration and/or the intent of Congress in endorsing the Compact. It suggests either of two alternatives to the standard of review for common law arbitration:
 
 
 24
 (1) the standard a court applies when reviewing an NLRB bargaining unit determination;
 
 
 25
 (2) the standard enacted in the Railway Labor Act or in any other statute.
 
 
 26
 We decline to adopt either innovation and adhere instead to the traditional standard of review for arbitration.
 
 
 27
 Arbitration under the Compact does have certain unique characteristics. That section which addresses arbitration provides:
 
 
 28
 (C) In the case of any labor dispute involving the Authority and such employees where collective bargaining does not result in an agreement, the Authority shall submit such dispute to arbitration composed of three persons.... The determination of the majority of the arbitration board shall be final and binding on all matters in dispute....
 
 
 29
 D.C.CODE ANN. Sec. 1-2431 (1981). The Compact broadly defines the term labor dispute:
 
 
 30
 The term labor dispute ... shall include any controversy concerning wages, salaries, hours, working conditions, or benefits, including health and welfare, sick leave, insurance or pension or retirement provisions ... and including any controversy concerning any differences or questions that may arise between the parties including ... the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, and the interpretation or application of such collective bargaining agreements ....
 
 
 31
 Id. Because "labor dispute" is so broadly defined, a vast range of nontraditional issues are subject to arbitration. Ordinarily, an arbitrator's award is limited to resolving employee grievances or interpreting collective bargaining agreements. See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In contrast, the arbitrator here determined the scope of the bargaining unit, a task which government entities like the National Labor Relations Board (NLRB) normally handle. Moreover, in the customary arbitral decision, the parties have some control over the scope of the issues that are submitted to the arbitrator. Under the Compact, the scope of the submission is defined by statute.
 
 
 32
 Yet, while the Compact arbitrator may have to fulfill nontraditional arbitral duties, the basic principles that support arbitration remain constant. As in traditional arbitration, Compact arbitration is designed to preserve industrial peace. The Compact provides that arbitration shall be "final and binding." In enacting this clause, Congress intended to create a structure under which labor and management would resolve their disputes in a manner that would not disrupt revenues or services. Congress desired industrial quietude to avoid a breach in the fare-box income stream. "The provision of [the labor] section [of the Compact] becomes very important since any curtailment of transportation might seriously reduce the revenues of the Transit Authority ...." S.REP. No. 82-931, 92nd Cong., 2d Sess. 8 (1972). As an additional indication of this congressional intent, we note that Congress chose words which create the expectation of finality, of decisions not subject to judicial second-guessing.
 
 
 33
 The motivation for Compact arbitration thus is similar to the motivation for traditional arbitration. In both instances the objective is the speedy and peaceful resolution of industrial strife. That Compact arbitration includes nontraditional subjects does not diminish the importance of this objective. Indeed, nontraditional issues have at least the same potential to disrupt service as do traditional issues. We see nothing in the purpose of the Compact which would warrant a standard of review in Compact arbitration that diminishes the focus on deference. Moreover, the Compact, through its arbitration provisions, requires that labor disputes be resolved in a manner other than that established by the National Labor Relations Act (NLRA). We find no evidence indicating that, despite this difference, Congress intended that we use that standard of review appropriate under the NLRA. We therefore decline to follow WMATA's suggestion that the arbitrator's performance of nonconventional tasks requires us to apply the higher standard of review that a court would use in reviewing an NLRB bargaining unit determination.
 
 
 34
 Obviously, Congress could have displaced the presumption that the standard of review be based on deference. Such a congressional displacement might appear in either the Compact itself or in another enactment. Turning first to the Compact, we discover no language that specifically addresses the parameters of our review. Compare D.C.CODE ANN. Sec. 1-2431 (1981) (the Compact) with 45 U.S.C. Sec. 153 First (q) (1976) (providing scope of review for the Railway Labor Act). Nonetheless, we are urged to hold that the Compact's "final and binding" language reveals a congressionally-approved standard of review. The legislative history, however, clearly belies this suggestion. The "final and binding" clause had nothing to do with judicial review. Rather, the clause was envisioned as a "no strike, no lock-out" provision. H.REP. No. 92-115, 92nd Cong., 2d Sess. 9 (1972). Simply, the Compact is silent as to the scope of judicial review.
 
 
 35
 The Compact's language and history thus offers no specific direction to the formulation of a unique standard of review. The district court, however, used the final and binding language as a bridge to another statute. The court analogized "final and binding" in the Compact to the same language in the Railway Labor Act, 45 U.S.C. Sec. 153 First (m) (1976), and concluded: "Because both the RLA and the Compact provide for compulsory arbitration and both denominate the resulting award as 'final and binding,' the court adopts the standards of the RLA for its review of the award at issue here." Joint Appendix at 10. Applying the congressionally-enacted standards of the RLA, the court reviewed the award only for compliance with the Compact's substantive requirements and for confinement to matters within the arbitrator's discretion. The district court also stated that it would have reviewed the arbitral decision for fraud or corruption had such faults been alleged.
 
 
 36
 In borrowing the standard of review from the RLA, the district court erred. Because the statutory framework of the RLA and of the Compact are substantially dissimilar, we cannot assume, without any supporting evidence of legislative intent, that the mere presence in both statutes of the words "final and binding" permits a court to superimpose the RLA's congressionally-enacted standard of review onto the Compact. We note only a few examples to illustrate the differences between the two enactments. The Compact subjects all conflicts to the same arbitral process and all arbitral decisions are "final and binding." In contrast, the RLA distinguishes between "major disputes" and "minor disputes," and only arbitral awards involving minor disputes are "final and binding." 45 U.S.C. Sec. 153 First (m). Moreover, while the Compact is silent as regards judicial review, the RLA explicitly delimits the scope of review. 45 U.S.C. Sec. 153 First (g). Accordingly, we cannot conclude that, simply because "final and binding" are words common to both statutes, the same standard of review applies.
 
 
 37
 Moreover, the Compact itself limits the effect of other statutes. Section 77 of the Compact specifically exempts the Authority "from all laws, rules, regulations, and orders of the signatories and of the United States otherwise applicable to such transit services and persons, except that laws, regulations and orders relating to the inspection of equipment and facilities shall remain in force and effect...." D.C.CODE ANN. Sec. 1-2431 (1981). We note, in passing, that among the statutes displaced by section 77 are the United States Arbitration Act and any local arbitration act. Indeed, the United States Arbitration Act, 9 U.S.C. Sec. 1 et seq. (1976) (USAA), indicates by its own terms that it is not applicable in the instant case. Section 2 of that Act limits the Act's application to "written provision[s] in a ... contract ... to settle a controversy thereafter arising out of such contract or transaction." The Arbitration Act thus envisions the "typical" situation where the parties agree to arbitrate disputes that arise from a contract. Because the agreement to arbitrate is established by the Compact, and because the Compact is not a "contract evidencing a transaction involving commerce," the USAA does not apply.
 
 
 38
 We hold that the common law of labor arbitration must be the source for our standard of review. No evidence exists to support the view that Congress intended the application of any standard of review different from that of the common law of arbitration. We are unconvinced that the inclusion of nontraditional subjects in the arbitral process requires a departure from the presumption of deference.
 
 
 39
 Notwithstanding the erroneous importation of RLA principles, a remand of the case is not necessary. The rule is well established that a decision of a lower court can be affirmed if "the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.' " SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (quoting Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937)). Applying the traditional standards for reviewing labor arbitration to the arbitral award in controversy, we uphold the result.
 
 B. Applying the Standard of Review
 
 40
 Any discussion of the scope of judicial review and arbitration must begin with the Steelworkers Trilogy. In that set of cases, the Supreme Court carefully delineated the relationship between a reviewing court and an arbitrator. In United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the Court embraced the common law's deference to arbitral awards. The Court, however, cautioned that arbitrators are not authorized to dispense their own "brand of industrial justice." And, in United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), the Court focused on what judicial review does not include. "The courts ... have no business weighing the merits of a grievance, [or] considering whether there is equity in a particular claim...." Id. at 568, 80 S.Ct. at 1346. See also United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960).
 
 
 41
 The Steelworkers Trilogy and its progeny permit a court to make three inquiries: (1) was the award arbitrary and capricious? (2) was the award sufficiently definite to allow enforcement? (3) did the arbitrator exceed the scope of his "jurisdiction"? 6 T. KHEEL, LABOR LAW Sec. 24.05, at 24-91 to 24-96 (1982). The "jurisdictional" inquiry itself has two components: the award must draw its "essence" from the collective bargaining agreement or from the "law of the shop," and the arbitrator cannot grossly deviate from his conferred authority or from the issues submitted for arbitration. See generally Devine v. White, 697 F.2d at 436 n. 80 (discussing scope of review). An arbitral award also will fail if the arbitrator demonstrates partiality or reaches a result contrary to record evidence. Id. A court, however, is bound to enforce the award even when the basis for the arbitrator's decision is ambiguous. W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum and Plastic Workers, --- U.S. ----, ----, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983).
 
 
 42
 Additionally, courts will not enforce an award that is contrary to law or explicit public policy. However, "[s]uch a public policy ... must be well-defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." W.R. Grace & Co., 103 S.Ct. at 2783. As a corollary to this rule, an arbitral award will not be enforced if it was procured by fraud or coercion. 6 T. KHEEL, supra, Sec. 24.05 at 24-11.
 
 
 43
 The principal contention on this appeal involves the arbitrator's treatment of supervisory, managerial, and confidential employees. In essence, the question is whether the arbitrator applied incorrect employee definitions, thereby unlawfully placing managerial, confidential, and supervisory workers within the bargaining unit. Although the NLRA does not affect our standard of review, see supra, the Compact incorporates by reference the NLRA's definition of employee as set forth at 29 U.S.C. Sec. 152 Section 66(B) of the Compact provides:
 
 
 44
 The Authority shall deal with and enter written contracts with employees as defined in section 152 of Title 29, United States Code, through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, hours....
 
 
 45
 D.C.CODE ANN. Sec. 1-2431 (1981). The Compact therein ties the NLRA definition of employee to the designation of that party with whom the Authority must bargain. In essence, then, the Compact requires that the NLRA employee definition be used in delimiting the scope of the bargaining unit. The arbitral decision thus should have reflected the NLRA's classification of employees. Moreover, because the referenced NLRA section has been interpreted as excluding supervisory, managerial, and confidential employees from bargaining units, see, e.g., NLRB v. Hendricks County Rural Electric Corp., 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1982); NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), the arbitrator should have excluded these groups from the Compact bargaining unit.
 
 
 46
 In addition to the statutory mandate, the application of the NLRA's employee definitions was required by the parties' submission. The submission of the unit composition issue clearly incorporated the definition of employee under the National Labor Relations Act. The Union's president avers that "it was understood and agreed by all parties that in determining which employees should be in or out of the bargaining unit, [the arbitrator] would apply the definition of employee contained in Sec. 2(3) of the National Labor Relations Act." Appellant's Appendix at 97. WMATA, in its Brief, also suggests that the arbitrator was to act in accordance with the NLRA. Accordingly, if the arbitrator acted inconsistently with the NLRA's definition of employees, he acted beyond the scope of his submission.
 
 
 47
 Because of its centrality to this appeal, the arbitral decision regarding the characterization of the employees is worth reproducing in toto:
 
 
 48
 Local 2 and WMATA sharply contested before the Arbitrator the question whether certain jobs were excluded from any bargaining unit because they were supervisory, managerial, or confidential jobs. With respect to claims of supervisory status, the applicable rules have been set forth in a number of decisions under the National Labor Relations Act, and the principles are well-established although their application to particular facts may be difficult. With respect to claims of managerial and confidential status, the parties are in disagreement over the applicable standard. [Local 2,] adopting the views of the National Labor Relations Board, would limit the reach of those terms to employees who formulate, determine, and effectuate management policies in the field of labor relations. WMATA urges a broader view which has been adopted by several federal courts of appeals following the Supreme Court decision in NLRB v. Bell Aerospace Co., 416 U.S. 267 [94 S.Ct. 1757, 40 L.Ed.2d 134]. The Arbitrator resolves this issue in favor of WMATA and will apply the judicially approved rather than the NLRB standard.
 
 
 49
 Appellant's Appendix 36-37.
 
 
 50
 We cannot conclude that the arbitrator applied incorrect employee definitions or deviated from the scope of his submission in his discussion of supervisory employees. The arbitrator referred to well-established principles, but did not identify the specific test. Although this may be ambiguous, ambiguity in itself is not a basis to set aside the award. See W.R. Grace & Company, supra. More importantly, the Authority introduced nothing which convinces this court that the arbitrator applied incorrect legal standards as to supervisors. WMATA has failed to carry the heavy burden necessary to displace the presumption that arbitral awards are to be enforced as written.
 
 
 51
 The arbitrator's treatment of managerial and confidential employees presents a slightly different issue. There, the arbitrator chose not to follow NLRB precedent but instead, at WMATA's urging, adopted the definition of these employees fashioned by appellate courts in reviewing NLRB decisions. Both the appellate court's and the NLRB's definitions were interpretations of the NLRA. In the year following the arbitral award, however, the Supreme Court endorsed the very NLRB definition that the arbitrator had rejected. NLRB v. Hendricks County Rural Electric Corp., 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1982). Nevertheless, the arbitral decision is enforceable. The arbitrator was bound to apply the law as it existed at the time of the submission. The arbitrator noted the conflict in that law and made a reasonable choice. Because we cannot require that an arbitrator have the ability to predict future Supreme Court decisions, we conclude that he acted properly in his choice of a standard. A holding to the contrary--that the arbitral award should be reopened--would require renewed arbitration over an issue theoretically resolved three years ago and therefore would undermine the objective of resolving labor disputes quickly. Moreover, parties unhappy with the award would have an incentive to procrastinate in the hope of a new interpretation of the labor laws. In any event, WMATA cannot now argue that the arbitrator erred in adopting a standard that WMATA itself pressed. Throughout the negotiations, WMATA has attempted to narrow the bargaining unit. WMATA thus benefitted from the arbitrator's choice because the standard adopted by the arbitrator placed fewer managerial and confidential employees in the unit than would be permitted under the Hendricks standard. Of course, the new standard would apply if the parties choose to re-arbitrate the scope of the bargaining unit.
 
 
 52
 We thus find no evidence which suggests that the arbitrator applied legal standards that were improper at the time of the submission. Similarly, an application of the other strands of the standard of review referenced by the Steelworkers Trilogy reveals no reason to deny the enforcement of the arbitral award. The arbitrator did not demonstrate partiality, did not reach an award contrary to public policy, and issued an award sufficiently definite for enforcement. Although the arbitrator did not explain his rationale for each job classification, we are unconvinced that he was arbitrary. Indeed, the arbitrator offered to provide explanations if either party had so requested. Moreover, the arbitrator's candid admission that he found insufficient evidence to classify five job categories implies that he found sufficient evidence as to the others.
 
 
 53
 Thus, we hold that the arbitral decision here in controversy is enforceable. Although the district court was too deferential to the arbitrator, it reached the proper result. We therefore affirm.
 
 
 54
 Because we hold that the arbitral decision is enforceable, we need not address the issue of whether the Authority's challenge came too late. The Authority waited approximately fourteen months before it challenged the award in court. Although we decline to delineate any specific time restraints, we nonetheless observe that speedy resolution of labor disputes promotes and preserves industrial peace. Thus, a party cannot wait for an indefinite period and then invoke a court's jurisdiction. In the instant case, however, WMATA did not sit idly during the interim period. In fact, the Authority engaged in ongoing negotiations allegedly aimed at a peaceful resolution of the dispute. Because good faith attempts to amicably resolve labor disputes should not be discouraged, we would be reluctant to hold that WMATA has waived its ability to seek judicial review. To determine the proper time restraints, a court might draw an analogy to NLRB bargaining unit determinations where resort to the courts is not appropriate until the election has occurred and one party has refused to bargain. See, e.g., Boire v. Greyhound Corp., 376 U.S. 473, 476-77, 84 S.Ct. 894, 896, 11 L.Ed.2d 849 (1964). Whether this is a proper analogy is a question to be decided in an appropriate case.
 
 III. THE INTERVENORS
 
 55
 We dismiss the appeals of Bircher and Peck without prejudice. This case came before us as an interlocutory appeal of a partial summary judgment in favor of Local 2 and against WMATA. The issue on appeal is the enforceability of the award as between the parties who actually engaged in arbitration. In holding that the award is valid, we intimate no opinion as to the rights, if any, of third parties affected by the agreement.* Moreover, our discussion above of the standard of review does not necessarily apply when an affected third-party alleges that his or her rights have been violated by an arbitration award.
 
 
 56
 The intervenors may be able to demonstrate in future proceedings that their placement within the unit was erroneous. That question, however, is not properly before us. Because we do not reach the merits of Bircher's and Peck's arguments, we dismiss their appeals without prejudice.
 
 
 57
 It is so ordered.
 
 
 
 *
 Intervenor Bircher argues on appeal that the use of a single arbitrator rather than the three required under the Compact renders the arbitration award unenforceable. WMATA argued the same issue in the district court but has since dropped it on this appeal. Assuming arguendo that Bircher has standing to raise this issue, we find the position meritless. On this issue, the district court's analysis is accurate and complete and is the basis for our conclusion