**LOCAL 300, NATIONAL POSTAL MAIL HANDLERS UNION, et al., Plaintiffs,**

**v.**

**NATIONAL POSTAL MAIL HANDLERS UNION, A DIVISION OF the LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO; and United States Postal Service, Defendants.**

**Civ. A. No. 91–0479–LFO.**

United States District Court,
District of Columbia.

June 3, 1991.

Paul Schachter, Reinhardt & Schachter, P.C., Newark, N.J., for plaintiffs.

Joseph E. Kolick, Jr., Carla M. Marcolin, David B. Killalea, Dickstein, Shapiro & Morin, Washington, D.C., for defendant Union.

Marina Utgoff Braswell, Asst. U.S. Atty., Washington, D.C., for defendant U.S.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs are several local unions of the National Postal Mail Handlers Union and several officers from one of those locals ("Locals"). They seek to restrain the implementation of a contract governing the relationship between the United States Postal Service (the "Service") and employees represented by the National Postal Mail Handlers Union ("National") for the period commencing November 20, 1990, as well as the National membership's pending ratification vote on that contract.

A hearing on plaintiffs' application for a temporary restraining order was held on March 14, 1991. Based upon the submissions of the parties and the argument at that hearing, the application was treated as one for a preliminary injunction and a further hearing was scheduled for a week later. In the interim, the defendants filed motions to dismiss or for summary judgment. After a hearing on March 21, 1991, an order of the same day denied the National's application for a preliminary injunction "[f]or reasons stated from the bench and to be more fully stated in ruling on the pending dispositive motions." This memorandum discusses those dispositive motions. For the reasons stated below, an accompanying order will grant defendants' motions and dismiss the complaint.

### I.

The contract between the Service and the National was negotiated pursuant to the Postal Reorganization Act of 1970. *See* 39 U.S.C. §§ 101–5605 (1988) [hereinafter, the "Act"]. The Act "provided for the first time that postal labor relations were to be similar to those in the private sector and were, to the extent consistent with the [Act], to be subject to the requirements of the National Labor Relations Act." *American Postal Workers Union, Local 6885 v. American Postal Workers Union*, 665 F.2d 1096, 1098 (D.C.Cir.1981) (citations

omitted). For the most part, the Act leaves the procedures for resolving labor disputes to the parties: "The Postal Service and bargaining representatives recognized under section 1203 may by mutual agreement adopt procedures for the resolution of disputes or impasses arising in the negotiation of a collective-bargaining agreement." 39 U.S.C. § 1206(c). The Act, however, prohibits strikes by postal employees. *See* 39 U.S.C. § 410(b)(1) (incorporating 5 U.S.C. § 7311(3)). Furthermore, cognizant of the effect of this prohibition on the bargaining position of the employees and also mindful of the overriding public interest in uninterrupted postal service, the Act mandates quick resolution of bargaining impasses through compulsory and binding interest arbitration. *See* 39 U.S.C. §§ 1207(c) & (d); *see also* H.R.Rep. No. 91–1104, 91st Cong., 2d Sess. 10 (1970), U.S.Code Cong. & Admin.News 1970, p. 3649 ("The existing ban on strikes by Federal employees is carried forward, and consequently, binding arbitration is provided for in the event of a bargaining impasse between the parties."); *accord* S.Rep. No. 91–912, 91st Cong., 2d Sess. 7–8 (1970).

Specifically, the Act provides that labor agreements may only be terminated or modified upon 90 days written notice and that the Federal Mediation and Conciliation Service must be notified "of the existence of a dispute within 45 days of such notice, if no agreement has been reached by that time." *Id.* § 1207(a). If the parties fail to reach a new agreement by the time that the existing agreement expires, the head of the FMCS must then appoint a factfinding panel. *See id.* § 1207(b). If after another ninety days no agreement is reached "or if the parties decide upon arbitration but do not agree upon the procedures therefor, an arbitration board shall be established...." *Id.* § 1207(c)(1). Finally, the Act provides that "[i]f the parties do not agree on the framing of the issues to be submitted, the

factfinding panel shall frame the issues and submit them to the arbitration board." *Id.*

## II.

Negotiations between the National and the Service began in August 1990 in contemplation of the expiration of the three-year contract into which the parties had entered on November 20, 1987.[1] These contract renewal negotiations between the Service and the National were the eighth since the postal reorganization in 1970.[2] Like all the ones preceding them, these negotiations were conducted pursuant to a protocol providing that

> any tentative agreement reached on a particular item was subject to a complete agreement on the terms of a new contract. Simply stated, we agreed that there was "no deal until there was a whole deal."[3]

Moreover, when this protocol was adopted, the parties understood that under the Act, if an entire agreement were not reached, their dispute would be subject to binding interest arbitration.[4]

On November 20, 1990, when the existing contract expired, the parties had failed to reach agreement on any item. Accordingly, the Service announced that it would proceed to interest arbitration.[5] However, pending initiation of that process the National and the Service agreed to renew informal negotiations with a view to reaching what agreement they could.[6] This phase of the negotiation continued from December 1990 until early February 1991.[7] In the process, the National succeeded in reaching tentative agreements that the Service would abandon "give backs" that it had sought, maintain cost-of-living allowances ("COLAs") for existing employees, and adopt an advantageous mechanism for cal-

---

1. *See* Affidavit of Glenn Berrien ¶ 3.

2. *See* Declaration of Joseph Mahon, Jr. ¶¶ 2–8.

3. Berrien Affidavit ¶ 4.

4. *See id.*

5. *See id.* ¶ 5.

6. *See id.* ¶¶ 6–7; Declaration of William J. Downes ¶ 3.

7. *See* Berrien Affidavit ¶ 7.

culating employee insurance premiums.[8] The National also persuaded the Service to continue a "no-lay-off" clause in the expiring contract which the Service had sought to eliminate.[9] In addition to withdrawing these "give-back" proposals, the Service agreed to substantial annual bonuses for employees plus an incentive payment.[10] The parties remained in impasse, however, with respect to COLAs for new employees: While the National demanded that COLAs commence on the first day of each new employee's service, the Service would only offer to commence COLAs for new hires after three years of employment.[11]

At this point, the National leadership was faced with a dilemma. On the one hand, it wanted to protect what it considered to be significant victories in the tentative agreement. On the other hand, it wanted to honor Article V, Section 9 of its Constitution which provides that its members:

> shall be entitled to ratify by majority vote national contracts in accordance with procedures published by the National Executive Board in a timely fashion prior to ratification. Members shall be entitled to be furnished with the text of any proposed changes and deletions together with their ballots.

National and Local Constitutions of the National Postal Mail Handlers Union As Amended by the National Convention November 7–10, 1988 and Judicially Approved, Art. V, § 9 (Affidavit of Laurence Q. Adams, Exhibit 1). Accordingly, when the Service suggested submitting not only the COLA issue but also the tentative agreement to the arbitration panel with the understanding that the tentative agreement would be incorporated into the panel's award, the National's negotiators hesitated.[12] The Service, however, made it abundantly clear that, consistent with the prac-

tice and understanding that there would be "no deal until there was a whole deal" it would not agree to submit only the COLA issue to the arbitration panel.[13] To resolve this impasse, the National proposed that after the arbitration was complete it would submit the entire agreement including the arbitration decision on the COLA issue to the membership for ratification.[14] The Service rejected this proposal taking the position that if both the tentative agreement and the disputed COLA issue were submitted to the arbitrators, the arbitration award would be final and binding and the ratification superfluous.[15] The National, while persisting in its stated intention to submit the entire package for ratification at the conclusion of the arbitration, nevertheless agreed to submit the tentative agreement for incorporation into the arbitrator's award in order to protect the gains that it had made in the tentative agreement.[16] This understanding was memorialized in a letter from the Service informing the Federal Mediation and Conciliation Service that the parties were proceeding

> with the understanding recently provided to the Postal Service by Union representatives that the interest arbitration award, which will be comprised of all the terms of our tentative agreements, as well as the sole issue which is to be decided by the Arbitration Board, is final and binding under the law.

Letter from Joseph P. Mahon, Jr. to Thomas Manley, February 5, 1991 (Mahon Declaration, Attachment 9).

Pursuant to this arrangement, the FMCS appointed a neutral arbitrator to sit on a panel of three with two others selected by the parties. See Award, *In the Matter of: United States Postal Service and National Postal Mail Handlers Union*, at 3 (February 20, 1991) (National's Opposition, Exhibit B) [hereinafter, "Award"]. The

---

8. *See id.* ¶ 10; Downes Declaration ¶ 4.

9. *See* Berrien Affidavit ¶ 10.

10. *See id.*

11. *See id.* ¶ 7; Downes Declaration ¶ 6.

12. *See* Mahon Declaration ¶ 13.

13. *See id.*

14. *See* Berrien Affidavit ¶ 12.

15. *See id.*

16. *See id.* ¶ 10.

record was opened on February 11, 1991, written submissions and other evidence were received until February 15, and a hearing was held on February 18. *See id.* Two days later, the Panel rendered an award.

The Panel began by observing that

[c]ommencing in July of 1990, the parties met both formally and informally on numerous occasions with the intent of negotiating a successor National Agreement to the 1987–1990 National Agreement. Despite the best efforts of the parties, these negotiations were not successful. On November 20, 1990, the negotiations terminated with the parties at impasse.

*Id.* at 2. It later noted that

[p]rior to the commencement of the interest arbitration proceedings, the parties had reached tentative agreement with respect to nearly all matters in dispute. This Arbitration Board approves those tentative agreements and incorporates by reference such provisions, which appear as Joint Exhibit 1 to this Award, into the 1990–1993 National Agreement. Unless otherwise described herein, all the remaining provisions of those Articles, Memoranda of Understanding or Letters of Intent which are found in the 1987–1990 National Agreement continue unchanged in the successor 1990–1993 National Agreement.

*Id.* at 3. The Panel then went on to observe that the tentative agreement embodied a fair and wise bargain:

In these difficult economic times, with the country facing war and recession, and the Postal Service facing technological changes, the parties' agreement reflects a wise policy choice. The Union has agreed to a contract which provides

the Postal Service with short-term savings, but protects job security and through the continuation of the COLA protects the real value of employees' wages. This award follows that policy and is consistent with the prior resolution of similar issues by Arbitrators ... in 1984.

*Id.* at 4. Finally, addressing the COLA issue, the Panel ruled that new employees should not receive COLAs during the first year of the prospective three-year contract but should enjoy them in its second and third years. *See id.* at 4–5.

The National was at first uncertain about the legal effect of the arbitrator's incorporation of the tentative agreement. Before the arbitrator's decision, the National informed its membership of the general terms of the tentative agreement and of its determination to "fight" the COLA issue by submitting it to arbitration.[17] It also announced the procedures for a referendum on the tentative agreement,[18] and on February 25, 1991, after the Panel issued its award, declared that it would challenge implementation of the terms of the tentative agreement pending a vote by the rank and file upon them.[19] However, a week later, upon advice of counsel, the National changed its position and conceded that the Panel's award was binding with respect to both the COLA issue and the matters addressed in the tentative agreement.[20]

Nevertheless, the National urged its members to vote in the referendum in order to "send an important political message to the Postal Service." [21] The referendum proceeded, producing 20,000 ballots,[22] and pursuant to a consent order between the Locals and the National, these ballots were

17. *See* Letter from Glenn Berrien and Marion T. Wright, February 6, 1991 (National's Opposition, Exhibit C).

18. *See* Affidavit of Laurence Q. Adams ¶ 25; Directive dated February 8, 1991 (National's Opposition, Exhibit D).

19. *See* Berrien Affidavit ¶ 19; Memorandum from Glenn Berrien to All Local Officers and

Stewards, February 25, 1991 (National's Opposition Exhibit F).

20. *See* Memorandum from Glenn Berrien and Marion Wright to All Local Officers and Stewards, March 4, 1991 (National's Opposition, Exhibit G).

21. *Id.*

22. *See* Berrien Affidavit ¶ 20.

impounded pending resolution of the Locals' application for a preliminary injunction. *See* Order of March 13, 1991 at 2.

### III.

The Locals contend that the Service and the National were not authorized to submit to the Panel, and the Panel consequently had no authority to incorporate, the tentative agreement. They argue that under the Act only issues in dispute may be submitted to arbitration. Furthermore, they contend that by submitting issues not in dispute to the Panel, the National violated its constitution and deprived its members of their right to vote on national contracts. Accordingly, they sue the National for violation of its Constitution and the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 101 *et seq.,* as well as for breach of its duty of fair representation. They also sue the Service for violating the Act, for violating the LMRDA, and for conspiring with the National to violate the National's duty of fair representation.

### A.

As a threshold matter the Service, joined by the National, argues that there is no private right of action under the Act to challenge the arbitration award. Because the Act does not expressly create a private right of action, the issue is whether the Act creates an implied right of action.

The Supreme Court has recently stated that "[i]n determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute." *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). The Supreme Court also noted that "[a]s guides to discerning that intent, we have relied on the four factors set out in *Cort v. Ash,* [422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)], along with other tools of statutory construction." *Id.* (citations omitted). The four factors set out in *Cort v. Ash* are: 1) whether the plaintiff is part of the class for whose benefit the statute was enacted; 2) the legislative intent; 3) the purposes of the statute; and 4) whether the cause of

action is one traditionally relegated to state law. *See Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087–88. Because the plaintiffs are clearly within the class of individuals for whose benefit the collective bargaining provisions of the Act were enacted and because there is apparently no state law action to vacate an arbitration award, the existence of an implied right of action turns upon the purposes of the Act and Congress' intent in passing it.

Defendants argue that the language of the statute makes Congress' intent clear. The statute provides that "[d]ecisions of the arbitral board shall be conclusive and binding upon the parties." 39 U.S.C. § 1207(c)(2). Defendants conclude that this language demonstrates that Congress did not intend arbitration awards under the Act to be challenged. Moreover, according to defendants, Congress' failure to expressly provide for a cause of action is significant, because the Act does provide for a cause of action for "violations of contracts between the Postal Service and a labor organization representing Postal Service employees." 39 U.S.C. § 1208(b). The defendants also point out that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979). Furthermore, the defendants argue, a private right of action would undermine Congress' intent to resolve labor disputes involving the postal service quickly through arbitration. Finally, the National observes that because arbitration under the Act is interest arbitration and there is no contract to construe, judges would not have any standards upon which to assess an interest arbitration award.

■ These arguments are convincing, but for the most part inapposite. Although it is clear beyond cavil that the substance of an arbitration award under the Act may not be challenged, the Locals do not attempt to challenge any particular determination of the Panel. Instead, they seek to challenge its authority to incorporate the

tentative agreement into its award and bind the Locals and their members to that award. The Federal Arbitration Act, which does not encompass labor contracts, allows federal courts to set aside arbitration awards "[w]here the arbitrators exceeded their powers." 9 U.S.C. § 10. More pertinently, in labor arbitrations not covered by that act or any other explicit statutory cause of action, the Supreme Court has traditionally reviewed whether an arbitrator has exceeded his or her authority. *See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). There is no reason to think that Congress meant to depart from this "common law" of arbitration. Moreover, such a departure would raise serious constitutional questions. It would violate due process to bind a person to an arbitration in which that party has not participated and to which he or she has not agreed to be bound. *See, e.g., Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). Implying a narrow right of action under the Act to challenge an arbitrator's award as beyond his jurisdiction would, thus, not only reflect traditional assumptions about the arbitral process; it would also avoid a serious constitutional infirmity. Accordingly, once the traditional tools of statutory construction are applied, *see, e.g., NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *see generally* Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 468, 468–69 (1989), it appears more likely than not that Congress intended to imply a cause of action under the Act, at least with regard to this narrow question.

This conclusion is buttressed by our Court of Appeals' decision in *Office & Professional Employees Int'l Union, Local 2 v. Washington Metropolitan Area Transit Authority*, 724 F.2d 133 (D.C.Cir.1983). In that case, the Court of Appeals considered the arbitration provision in the WMATA Compact. The Compact like the Act provides for "final and binding" arbitration on a range of issues including "any controversy concerning wages, salary, hours, working conditions, or benefits." D.C.Code § 1–2431 (1988) (¶ 66(c)). Nonetheless, the Court of Appeals reviewed the arbitration award. Although the defendant in that case apparently did not raise the issue, and to that extent the decision is not precisely on point, it is significant that the Court of Appeals applied the "traditional standards for reviewing labor arbitration" embodied in cases like *United Steelworkers v. Enterprise Wheel & Car Corp. See Office & Professional Employees v. WMATA*, 724 F.2d at 139. If our Court of Appeals assumes that under the Compact it can review "final and binding" interest arbitration awards, and if it borrows the standards for judging those awards from the "common law" of labor arbitration, it follows that the Act should likewise be interpreted to provide the sort of review of arbitration awards available under the common law of labor arbitration.

### B.

■ The National next argues that plaintiffs lack standing to seek an order vacating or modifying the Panel's award. The National points to a Seventh Circuit case involving an interest arbitration in which the plaintiffs attempted to challenge the arbitrator's award as exceeding his authority. *See Anderson v. Norfolk & W. Ry. Co.*, 773 F.2d 880 (7th Cir.1985). The Seventh Circuit observed that "[i]n analogous cases, courts have held that individual employees have no standing to challenge an arbitration proceeding to which the Union and the employer were the sole parties." *Id.* at 882. It therefore held that union members did not have standing to challenge arbitration awards negotiated by the union. *See id.* The Seventh Circuit's conclusion reflects a well-settled rule. *See id.* (listing cases). There is, however, an equally well-settled exception to this rule: An "employee may ... challenge the arbitration award where he or she alleges and proves that the union breached its duty of fair representation, thereby subverting the arbitral process." *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 406 (6th Cir. 1988) (citations omitted). Thus, in order to determine whether plaintiffs have standing

to argue that the arbitration award violated the Act by exceeding the authority of the arbitrators, it is first necessary to determine whether there was any breach of the National's duty of fair representation. As a consequence, the question of plaintiffs' standing to bring claims under the Act is intertwined with the substance of plaintiffs' claims of breach of the Constitution and of the National's duty of fair representation.

## C.

■ In essence, the Locals argue that the issues subject to the tentative agreement were not in dispute. Thus, the Locals contend, the National failed to protect its members' right, guaranteed by the union's constitution, to vote on "national contracts." The National, however, contends that there was no final agreement upon any issues, but only a tentative resolution of some issues not binding the parties.

The National's characterization of the facts is persuasive. The Service and the National negotiated under an understanding that there was "no deal until there was a whole deal." *See supra* at 201. Such conditions are standard in the Service's negotiations and typical in labor negotiations in general. *See* Berrien Affidavit ¶ 4; Declaration of William J. Downes ¶ 10; Declaration of Joseph P. Mahon, Jr. ¶ 11. Thus, the tentative agreement was not a contract because the parties had not agreed to be bound by the terms of the tentative agreement. Furthermore, the Service carefully stated this position when the tentative agreement was reached. When the National brought up ratification of the terms of the tentative agreement, the Service made it clear that it would not agree to submit to arbitration the COLA issue alone and allow the National to vote on the rest of the provisions. *See supra* at 202. It must therefore be concluded that there was no "contract" upon which the union members might vote.

The Locals assert that the National violated the Constitution by agreeing to submit the tentative agreement to arbitration.[23] They do not, however, explain why the right of members under the Constitution to vote on "national contracts" prohibits the National from submitting tentative agreements to an arbitrator. The National, as well as other unions, have followed this procedure several times before. Indeed, it is the Service's longstanding practice under the Act to incorporate significant tentative agreements with its union in final arbitral awards. Since 1971, the Service has been a party to seven interest arbitration awards, all of which have incorporated by reference the agreements reached before arbitration. *See* Downes Declaration ¶¶ 11–12. Two of these awards involved the National alone, and three others involved the union through the American Postal Workers Union. *See id.* ¶ 12. Given these facts, it is unlikely that the National's Constitution would have banned this practice without referring to something more specific than a right to vote on "national contracts." More fundamentally, the National has interpreted the Constitution to allow such bargaining practices. Because the interpretations of union officials of their own Constitution deserve deference, *see, e.g., American Postal Workers Union, Local 6885 v. American Postal Workers*, 665 F.2d at 1101, and because this interpretation is well-founded, it must be accepted. Accordingly, the undisputed facts demonstrate that the National did not violate its Constitution.

In the absence of any violation of the Constitution, the Locals' fair representation claim also fails. In the arbitration context, a union breaches its duty of fair representation only if its conduct is arbitrary or in bad faith. *See Vaca v. Sipes*, 386 U.S. at 207, 87 S.Ct. at 925. In other words, its behavior must be "so far outside a wide range of reasonableness that it is wholly 'irrational' or 'arbitrary.'" *Air Line Pilots Association, Int'l v. Joseph E.*

---

**23.** At points, the Locals also suggest that the Service engaged in an unfair labor practice by refusing to allow a vote on the tentative agreement. Such a claim of refusal to bargain in good faith falls under the exclusive jurisdiction of the National Labor Relations Board. *See, e.g., Vaca v. Sipes*, 386 U.S. 171, 178, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967).

*O'Neill*, ‒‒ U.S. ‒‒, ‒‒, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991) (quotation and quotation marks omitted). The National has, however, offered a quite rational explanation of its decision to stipulate the tentative agreement and submit it to the arbitrator for inclusion in the award. In the National's view, it was faced with three options: accepting the Service's final proposal, proceeding to arbitration on all issues, or seeking arbitration on the issue of COLAs for new hires and stipulating all other issues. *See* Berrien Affidavit ¶ 9. The first option was unacceptable because the Service's final offer on the COLA provision was unacceptable. *See id.* The second option was too risky: Although the National might conceivably be awarded better terms in an arbitration award, it felt that it had successfully evaded the "give backs" sought by the Service and that the Panel might well award some give backs to the Service. *See id.* ¶ 10. Accordingly, the National decided to protect what it viewed as successful negotiations on most of the contract and submit the final issue to arbitration. Such "decisions regarding bargaining strategy and the relative merits of different bargaining postures are precisely the type of judgments left to the discretion of the negotiator." *American Postal Workers Union, Local 6885 v. American Postal Workers Union*, 665 F.2d at 1106 (citation omitted).

 In sum, the National did not clearly violate the terms of the Constitution by agreeing that the arbitrator would incorporate the tentative agreement, and because its decision to agree was not arbitrary, it did not breach its duty of fair representation by doing so. Accordingly, summary judgment must be entered on plaintiffs' claims for breach of the Constitution, breach of the duty of fair representation, and conspiracy to breach the duty of fair representation. Furthermore, because there was no breach of the duty of fair representation, plaintiffs do not have standing to challenge the arbitration award and that claim must be dismissed as well.

## D.

 Moreover, even if plaintiffs had standing to challenge the arbitration award, their challenge would fail. The Act provides the parties with a broad latitude to "by mutual agreement adopt procedures for the resolution of disputes or impasses arising in the negotiation of a collective bargaining agreement." 39 U.S.C. § 1206(c). Indeed, the Act seems to contemplate the parties' agreeing upon the procedures for arbitration: Section 1207(c) provides for mandatory arbitration procedures not only when "no agreement is reached," but also when "the parties decide upon arbitration but do not agree upon the procedures therefor." By implication, the parties may follow any arbitration procedures upon which they agree. Moreover, the procedures adopted by the parties are hardly controversial. Around the time the Act was passed, the American Arbitration Association recognized that

> [p]rior to issuance of an award, the parties may jointly request the arbitrator to include in the award certain agreements between them, concerning some or all of the issues. If the arbitrator believes that a suggested award is proper, fair, sound, and lawful, it is consistent with professional responsibility to adopt it.

American Arbitration Association, *Code of Professional Responsibility for Arbitrators of Labor–Management Disputes* § 2(I)(1) (1974). The arbitration panel here reviewed the tentative agreement and found it to "reflect[] a wise policy choice." Award at 4. Because the Act gives parties broad discretion to fashion dispute resolution procedures and because the procedures adopted and followed in the arbitration were well-known and approved of at the time Congress passed the Act, there is no reason to think that the submission of tentative agreements for incorporation in the final arbitration award would violate the Act.

## E.

 Finally, the Locals claim that their entitlement to "equal rights and privileges" under section 101(a)(1) of the LMRDA were violated. Because the members of the Na-

tional do not have a right to vote on the terms of the tentative agreement, *see supra* 206–207, summary judgment must be entered on these claims as well.

### IV.

In view of the foregoing, the accompanying order will enter summary judgment for the defendants denying plaintiffs' claims for breach of the Constitution, for breach of the duty of fair representation, and for violations of the LMRDA. The order will also dismiss plaintiffs' challenge to the Panel's award for lack of standing and dismiss the complaint.

### ORDER

For reasons stated in the accompanying Memorandum, it is this 3rd day of June, 1991, hereby

ORDERED: that the Federal Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment should be, and is hereby, GRANTED; and it is further

ORDERED: that Defendant Union's Motion to Dismiss or for Summary Judgment should be, and is hereby, DENIED; and it is further

ORDERED: that Plaintiff Motion for Summary Judgment should be, and is hereby, DENIED; and it is further

ORDERED: that the complaint should be, and is hereby, DISMISSED.